UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLUEWATER NETWORK,                    )
a team of Friends of the Earth        )
300 Broadway, Suite 28                )
San Francisco, CA 94133,              )
                                      )
FRIENDS OF THE EARTH,                 )
1717 Massachusetts Avenue, N.W.,      )
Suite 600                             )
Washington, DC 20036,                 )
                                      )
THE WILDERNESS SOCIETY,               )
1615 M Street, N.W.                   )
Washington, D.C. 20036,               )
                                      )
and                                   )
                                      )
ROBERT GOODMAN,                       )
36706 Angeline Circle                 )
Livonia, MI 48150,                    )
                    Plaintiffs,       )
                                      )
            v.                        )
                                      )
DIRK KEMPTHORNE, Secretary,           )
Department of the Interior            )
1849 C Street, N.W.                   )
Washington, D.C. 20240,               )
                                      )
and                                   )
                                      )
MARY BOMAR, Director,                 )
National Park Service                 )
Department of the Interior            )
1849 C Street, N.W.                   )
Washington, D.C. 20240.               )
                                      )
Defendants.                           )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This suit challenges the National Park Service's ("NPS" or "Park Service")

reintroduction of loud, environmentally destructive, and dangerous personal watercraft, or

"Jetskis," into two National Park Units – Gulf Islands National Seashore and Pictured Rocks

National Lakeshore – where they had been banned. By reversing the ban on Jetskis in these areas

based on patently deficient Environmental Assessments, NPS is violating the Park Service

Organic Act, 16 U.S.C. § 1, et seq., the National Environment Policy Act ("NEPA"), 42 U.S.C.

§ 4321, et seq., the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the agency's

2001 Settlement Agreement ("2001 Settlement") (attached as Exhibit 1) with Bluewater Network

approved by this Court in Bluewater Network v. Stanton, No. 00-2093 (GK) (D.D.C.) (hereafter

"Bluewater I").

## JURISDICTION

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

3.    Plaintiff Bluewater Network, a team of Friends of the Earth ("Bluewater/FOE"), is

a national environmental organization protecting public waters, lands, and ecosystems.

Bluewater/FOE fights damage caused by motorized recreation, oil and shipping industry

practices, and other types of marine pollution. Bluewater/FOE and its members have been

actively involved in working to minimize the damage caused to national park areas by Jetskis. In

November 1997, Bluewater petitioned the Service to ban Jetski use in national park areas; that

petition led to the Park-wide Jetski regulation issued in 2001.

2

4.     Bluewater/FOE brings this suit on behalf of its members, who enjoy national park areas where Jetski use is permitted. For example, member Enid Sisskin lives in Gulf Breeze, Florida, and enjoys boating in the waters surrounding Gulf Islands National Seashore, which she visits several times each summer. She enjoys the natural quiet, the solitude, and the shore birds and other wildlife she can see from her boat. Ms. Sisskin's experiences in Gulf Islands have been repeatedly diminished by the Jetskis that are permitted there. They speed across the water with their engines roaring, even close to the shoreline, where they often upset the shore birds, who fly away at their approach. In the fifteen years that Ms. Sisskin has been visiting Gulf Islands, including in recent years, she has not observed any enforcement of Jetski regulations, or seen evidence of efforts to educate Jetski users regarding the borders of the "no-wake" zone that is supposed to protect the Seashore. Ms. Sisskin's and other Bluewater/FOE members' interests in enjoying Gulf Islands, and other Park units where Jetskis are permitted, are harmed by the defendants' failure to comply with NEPA, the Park Service Organic Act, the APA, and the 2001 Settlement Agreement, because Jetskis diminish their enjoyment and appreciation of areas where permitted.

5.     Founded in 1935, plaintiff The Wilderness Society ("TWS") is a non-profit organization with approximately 200,000 members dedicated to protecting a national network of wild lands and fostering an American land ethic. TWS works to ensure wise management and protection of America's public lands. TWS brings this suit on behalf of its members who use and enjoy national park areas where Jetski use is permitted. The interests of TWS's members in protecting the pristine environmental qualities of these areas are harmed by the defendants'

3

failure to comply with NEPA, Park Service Organic Act, the APA, and the 2001 Settlement, because Jetskis diminish their enjoyment and appreciation of areas where permitted.

6.      Plaintiff Robert Goodman, who was also a plaintiff in Bluewater I, lives in Livonia, Michigan, and enjoys kayaking in areas where he can enjoy natural quiet, clean air and water, and flora and fauna in their native environments. Among the places Mr. Goodman has visited in his kayak are Pictured Rocks National Lakeshore and Isle Royale National Park in Michigan. During a visit to Pictured Rocks in the 1990s, Mr. Goodman's experience was marred by the sights and sounds of Jetskis in the area. As a result, at present he prefers to visit Isle Royale, where Jetskis are not permitted.

7.      Although Mr. Goodman is currently considering several options for upcoming kayaking trips, he will not return to Pictured Rocks so long as Jetskis are permitted there. If Jetskis are banned in Pictured Rocks, Mr. Goodman intends to visit there again. Mr. Goodman's interest in enjoying Pictured Rocks is harmed by the defendants' failure to comply with NEPA, the Park Service Organic Act, the APA, and the 2001 Settlement Agreement, because Jetskis so diminish his enjoyment and appreciation of areas where they are permitted that he will refrain from using such areas for recreational purposes.

8.      Defendant Dirk Kempthorne is the Secretary of the Interior and is ultimately responsible for all activities in units of the National Park System.

9.      Defendant Mary Bomar is the Director of the National Park Service and is directly responsible for the supervision, management and control of the units of the National Park System.

4

## STATUTORY FRAMEWORK AND FACTS GIVING
## RISE TO PLAINTIFFS' CAUSES OF ACTION

A.    **Statutory and Regulatory Framework**

1.    **The Park Service Organic Act**

10.    The Park Service Organic Act, passed in 1916, created the National Park Service to "promote and regulate" the public use of our national Parks, "by such means and measures" as necessary to conform to the "fundamental purpose" of the Parks – to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same [so as to] leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. Congress reaffirmed this commitment in 1970, instructing that the Park Service shall not administer the parks "in derogation of the values and purposes for which these various areas have been established . . . ." Id. at § 1a-1.

11.    In 2006, the Park Service issued revised Management Policies. Recognizing that "many forms of recreation enjoyed by the public do not require a national park setting and are more appropriate to other venues," the Policies direct the Park Service to focus on providing "opportunities for forms of enjoyment that are uniquely suited and appropriate to the superlative natural and cultural resources found in the parks." Management Policies at 8.1. With regard to loud, motorized craft like Jetskis, the Management Policies recognize that "the sounds of motor vehicle[s] . . . can greatly diminish the solemnity of a visit to a national memorial, the effectiveness of a park interpretive program, or the ability of a visitor to hear a bird singing its territorial song," and instruct the Park Service "to preserve the natural quiet and natural sounds associated with the physical and biological resources of parks." Id. at 8.2.3.

5

2.    **The National Environmental Policy Act**

12.    NEPA is our Nation's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purpose is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." Id. at § 1500.1(c). Under NEPA, federal agencies are required to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C). This EIS must describe (1) the "environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." Id.

13.    The Council on Environmental Quality ("CEQ") – an agency within the Executive Office of the President – has promulgated regulations implementing NEPA that are "binding on all federal agencies." 40 C.F.R. § 1500.3. These regulations require that, unless an activity is "categorically excluded" from NEPA compliance, before taking an action an agency must either prepare an EIS, or, at the very least, an Environmental Assessment ("EA") to determine whether an EIS is necessary. Id. § 1501.4.

14.    Among the factors an agency must consider to determine whether a project may have "significant" impacts, therefore requiring an EIS, are the "context" and "intensity" of the action. 40 C.F.R. § 1508.27. Regarding context, the CEQ regulations provide that, for a "site-

6

specific action," an agency must determine whether the "effects on the locale" are significant. Id. § 1508.27(a).

15.    As for intensity, the regulations provide that an action is more likely to have a "significant" impact, and therefore require an EIS, where (a) the action is taking place in "unique . . . ecologically critical areas [such as] park lands"; (b) "the proposed action affects public health and safety"; or (c) "the effects on the quality of the human environment are likely to be highly controversial." Id. § 1508.27(b).

16.    Irrespective of whether an EIS is required, where an agency prepares an EA it must adequately address the environmental impacts of both its proposal and reasonable alternatives, and it must "provide sufficient evidence and analysis for determining whether to prepare" an EIS. Id. § 1508.9.

17.    If, after preparing an EA, the agency concludes that an EIS is not necessary, it must issue a Finding of No Significant Impact ("FONSI") that adequately explains why the project will "not have a significant effect on the human environment" and an EIS will not be prepared.  40 C.F.R. § 1508.13.

B.    **Relevant Facts**

    1.    **Jetskis and The Park Service's Original Jetski Ban**

18.    Jetskis – also called waverunners, wavejammers, sea-doos, wet bikes, surf jets, or, generically, Personal Watercraft ("PWCs") – are small, high-speed watercraft designed for speed and maneuverability.  Capable of speeds in excess of 60 miles per hour, Jetskis are often used as high-speed thrill vessels to weave between boats, jump wakes, race, and circle repeatedly.

7

19.     Jetskis were first introduced in the 1960's and began to grow in popularity in the 1970's and 1980's. They eventually became the fastest growing segment of the U.S. boating industry, accounting for one-third of all boat sales. Annual sales have exceeded 80,000 units, and there are more than 1.5 million Jetskis in use in the United States today.

20.     Jetskis have significant adverse impacts on the national parks. They disturb shorebirds and marine wildlife; they destroy seagrasses and other aquatic vegetation; and they degrade the experiences of those who visit our Parks for their natural beauty and soundscapes, but instead are confronted by these loud and polluting vehicles.

21.     Jetskis – particularly those with 2-stroke engines permitted in both Parks at issue here – can generate high noise levels, comparable to that of a noisy city street. Jetski noise is particularly irritating to other park visitors because of the constant noise and pitch fluctuation as the Jetski engine goes in and out of the water. The sound is further exacerbated by Jetski maneuvers like jumping wakes, rapid acceleration and deceleration, and quick turns and spinning – all of which are commonly performed on Jetskis.

22.     Jetskis are also quite dangerous. Even when they were less than 10% of the boating market more than ten years ago, Jetskis were responsible for 40% of boating injuries, including injuries to other park visitors.

23.     Jetskis, especially those with 2-stroke engines, are also highly polluting vehicles. The two-stroke engines operate on a mixture of gasoline and oil, and during normal operation discharge up to 30% of this mixture unburned into the water – up to three gallons during an average two-hour ride. According to the U.S. Environmental Protection Agency, in past years

8

Jetskis have dumped up to one billion pounds of petroleum hydrocarbon pollution into U.S. waters – 15 times more than the amount spilled by the Exxon Valdez.

24.    Jetskis can also emit large volumes of air pollution. A seven-hour ride on a 100 horsepower 2-stroke Jetski emits the same amount of air pollution as 1998 passenger car driven 100,000 miles.

25.    In light of these impacts, in 1998 Bluewater submitted a formal Rulemaking Petition under the APA seeking a regulation to prohibit Jetskis from all units of the National Park System. Finding the Petition and the scientific studies on which it was based convincing, the Park Service issued a Proposed Regulation to put the Jetski ban into effect. 63 Fed. Reg. 49,312 (1998). The Proposed Rule explained that due to the adverse impacts of Jetskis – including disruption, injury, and death of wildlife and aquatic vegetation; excessively high noise levels and changes in pitch; harassment and injury of swimmers and boaters; and water and air pollution – the agency "presumes that, as a general matter, Jetski use is inappropriate in most units of the National Park System." 63 Fed. Reg. at 49,314.

26.    In 2000, the agency issued its Final Rule implementing a general ban on Jetski use in National Park System Units. 65 Fed. Reg. 15077 (Mar. 21, 2000); see also 36 C.F.R. § 3.24 (Jetski Rule). Among other findings, the Park Service explained that Jetskis "adversely impact[ ] wildlife"; "can have a direct and adverse effect on park values such as peace and quiet"; and can release "high levels of hydrocarbon emissions, . . . excessive smoke and smell." Under the new Rule, before the Park Service could permit Jetski use in a Park Unit, the agency would have to undertake a park-specific rulemaking.

27.    As promulgated, the Rule contained two exceptions from this general requirement. First, Parks that had a history of Jetski use were given a two-year "grace period" before the ban would go into effect. Pursuant to the grace period, while the agency might make an affirmative decision to ban or allow Jetski use at a specific Park at any time, if no such decision was made within two years they would automatically be banned. Second, for a subset of those Parks, the Rule authorized the Park Service to informally decide that Jetski use could continue indefinitely, without undertaking any rulemaking.

## 2.    Bluewater I and The Park Service's Implementation Of The Jetski Ban

28.    Seeking to limit the exceptions provided in the Jetski Rule, Bluewater and others filed a lawsuit challenging these two exceptions. Bluewater Network v. Stanton, No. 00-2093 (GK) (D.D.C., filed August 31, 2000) ("Bluewater I"). The parties then negotiated a Settlement Agreement with several requirements. See Exhibit 1. First, rather than the informal approval process the Rule authorized for some Parks, the Agreement requires that before the agency may permit Jetski use to continue at any park it must first complete a Park-specific rulemaking, accompanied by appropriate review pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq. Second, any such rulemaking and NEPA review must address "the impacts of [Jetski] use in the particular unit," including "impacts on water quality, air quality, soundscapes, wildlife and wildlife habitat, shoreline vegetation, and visitor conflicts and safety." Exhibit 1 at 2 (¶ 5). Finally, the Agreement – and several subsequent modifications – also extended the grace periods at certain Parks. This Court approved, and retained jurisdiction over, the Settlement on April 12, 2001. Id. at 5.

10

29.    Several months after the Settlement Agreement was approved, the Park Service decided that Jetski use is inappropriate at a number of Park Units.  For example, in October 2001 the agency made this determination at Gulf Islands National Seashore ("Gulf Islands") – a 160 mile stretch of barrier islands in the Gulf of Mexico, off the shores of Florida and Mississippi.  In banning Jetskis at Gulf Islands, the Park Service explained that Jetski use "poses considerable threats to estuarine flora and fauna, pollutes waters essential to estuarine and marine health, poses unacceptable risks of injury to operators and bystanders, and conflicts with the majority of other longstanding uses of the Seashore."

30.    At other Parks the agency allowed the grace period to expire, at which point the automatic ban provided by the Jetski Rule went into effect.  For example, the agency allowed the grace period to expire at Pictured Rocks National Lakeshore ("Pictured Rocks") – 42 miles of Lake Superior shoreline along Michigan's upper peninsula.  Accordingly, Jetski use was banned in that Park as of April, 2002.

**3.    The Park Service's Unlawful Reintroduction Of Jetskis Into National Parks**

31.    Despite the Park Services' general findings regarding Jetski impacts, and the specific findings of adverse impacts at Park Units like Gulf Islands, in the past several years the agency has reversed course, and reauthorized Jetski use at approximately ten Units where they had been banned, including Gulf Islands and Pictured Rocks.

32.    At Gulf Islands, the Park Service's Proposed Regulations and Draft Environmental Assessment ("DEA") elicited more than 4,500 comments, most of which opposed Jetski use at the Park.  Many commenters were particularly concerned by the fact that the Park Service had not identified any evidence or scientific studies showing that its earlier decision –

11

i.e., its decision only a few years earlier that any Jetski use in the Park would be "in derogation of the values and purposes for which the Seashore has been established" – had been erroneous.

33.    Commenters were also concerned with whether the Park Service had meaningfully considered the site-specific impacts of Jetskis on park resources in Gulf Islands, as required by the 2001 Settlement. In 2006, the agency issued a FONSI and Final Regulation reopening Gulf Islands to Jetskis without adequately addressing these concerns. See 71 Fed. Reg. 26,232 (May 4, 2006); see also 36 C.F.R. § 7.12.

34.    In October, 2006, after issuing another Proposed Rule and DEA, the Park Service issued another FONSI and Final Rule, this one allowing Jetskis to return to Pictured Rocks. See 70 Fed. Reg. 61,896 (Oct. 27, 2006); see also 36 C.F.R. § 7.32. This decision was also made over the objections of most commenters, without adequate site-specific analysis, and in contravention of the Park Service's statutory mandate to preserve the "superb environmental quality" of our National Parks. 16 U.S.C. § 1a-1.

### 4.    **Plaintiffs' Efforts To Resolve These Issues Without Further Litigation**

35.    In December, 2007, plaintiffs wrote to the Park Service, explaining that the agency had no legitimate rationale for overturning the ban on Jetskis at Gulf Islands or Pictured Rocks. Plaintiffs further explained that the agency had violated the 2001 Settlement Agreement, which requires that decisions to reintroduce Jetskis into a Park unit must be based on site-specific analyses of the impacts of Jetskis on "water quality, air quality, soundscapes, wildlife and wildlife habitat, shoreline vegetation, and visitor conflicts and safety." Neither of these decisions was based on any such site-specific analyses.

36.    Finally, plaintiffs explained that these decisions also violated NEPA. In particular, plaintiffs explained that the agency should have prepared an EIS for each Park in light of the sensitive resources at issue and the severity of the impacts at stake. Plaintiffs further explained that the EAs were deficient in and of themselves, because they provided generic descriptions of various environmental impacts, and failed to consider reasonable alternatives.

37.    The Park Service has not agreed to reconsider its decisions to reopen these Parks to Jetskis.

## PLAINTIFFS' CLAIMS FOR RELIEF

## CLAIM ONE

(Park Service Organic Act and the APA)

38.    By issuing a Final Rule permitting Jetski use at Gulf Islands, despite the agency's earlier findings that Jetski use "is not compatible with the goals and objectives for the management of Gulf Islands" and "pose[s] an unacceptable threat to park resources and values," the Park Service is violating the Park Service Organic Act, 16 U.S.C. §§ 1, 1a-1, and is acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. 5 U.S.C. § 706.

39.    By issuing a Final Rule permitting Jetski use at Pictured Rocks, despite the agency's earlier findings about the adverse impacts of Jetskis, the Park Service is violating the Park Service Organic Act, 16 U.S.C. §§ 1, 1a-1, and is acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. 5 U.S.C. § 706.

40.    These legal violations are injuring plaintiffs in the manner described in paragraphs 3-7 above.

## CLAIM TWO

(NEPA and the APA)

41.    By deciding to reintroduce Jetskis into Gulf Islands and Pictured Rocks without first preparing legally sufficient EISs, the Park Service is violating NEPA, 42 U.S.C. § 4332, and is acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.  5 U.S.C. § 706.

42.    By failing to adequately consider the environmental impacts of its proposed action in reintroducing Jetskis into Gulf Islands and Pictured Rocks, or adequately to consider reasonable alternatives, the Park Service is violating NEPA, 42 U.S.C. § 4332, and acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "without observance of procedure required by law," in violation of the APA.  5 U.S.C. § 706.

43.    These legal violations are injuring plaintiffs in the manner described in paragraphs 3-7 above.

## CLAIM THREE

(2001 Settlement Agreement and the APA)

44.    By reintroducing Jetskis into Gulf Islands and Pictured Rocks without considering "the impacts of [Jetski] use in the particular unit," including "impacts on water quality, air quality, soundscapes, wildlife and wildlife habitat, shoreline vegetation, and visitor conflicts and safety," Exhibit 1 at 2 (¶ 5), the Park Service is violating the 2001 Settlement Agreement, and

14

acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. 5 U.S.C. § 706.

45.     These legal violations are injuring plaintiffs in the manner described in paragraphs 3-7 above.

Wherefore, plaintiffs respectfully request that this Court:

1.      declare that the Park Service is violating the Park Service Organic Act, NEPA, the APA, and the 2001 Settlement by issuing Final Rules reauthorizing Jetski use at Gulf Islands and Pictured Rocks;

2.      set aside and remand the Park Service's FONSI's for Jetski use at Gulf Islands and Pictured Rocks;

3.      set aside and remand the regulations authorizing Jetski use at Gulf Islands (36 C.F.R. § 7.12) and Pictured Rocks (36 C.F.R. § 7.32);

4.      award plaintiffs their costs and attorneys' fees; and

5.    award plaintiffs such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Howard M. Crystal
(D.C. Bar No. 446189)

Eric R. Glitzenstein
(D.C. Bar No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206

May 15, 2008                    Attorneys for plaintiffs

16

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                                    |     |                    |
| ---------------------------------- | --- | ------------------ |
| BLUEWATER NETWORK, et al.          | )   |                    |
|                                    | )   |                    |
|                                    | )   |                    |
|           Plaintiffs,              | )   | 00CV02093 (GK)     |
|                                    | )   |                    |
| v.                                 | )   |                    |
|                                    | )   |                    |
| ROBERT STANTON, et al.,            | )   |                    |
|                                    | )   |                    |
|           Defendants.              | )   |                    |
|                                    | )   |                    |

## STIPULATED SETTLEMENT AGREEMENT

A.    Plaintiffs' complaint seeks declaratory and injunctive relief related to a March 2000

Final Rule of the National Park Service ("Service"), which permits personal watercraft ("PWC"),

also known as a jet ski or waverunner, use to continue in 21 national park units.  See 65 Fed. Reg.

15,077.  The Final Rule allows PWC use to continue in these park units for two years, after which

the superintendents in ten of those units may authorize PWC use to continue either annually via a

Park Superintendent's Compendium or indefinitely by promulgation of special regulations.  The

remaining 11 units may authorize continued PWC use only via promulgation of special

regulations.  Plaintiffs assert that the Final Rule violates the National Park Service Organic Act,

16 U.S.C. § 1 et seq., and its implementing regulations, and the Administrative Procedure Act, 5

U.S.C. § 706.

B.    Defendants deny that they have violated any federal statutes or regulations in

connection with the PWC Final Rule, oppose plaintiffs' request for relief, and assert that plaintiffs

are not entitled to such relief.

C.    Without making any concession of law or fact, the plaintiffs and the defendants

(hereinafter the "parties"), in consideration of the terms outlined below, believe that it is in their

mutual interest to enter into this Settlement Agreement.

Accordingly, it is hereby agreed that:

1.    As provided in the PWC Final Rule, with the exception of those National Park System ("NPS") units listed in Table 1 and Table 2 in that rule, after April 22, 2000, PWC use in NPS units is prohibited unless authorized by promulgating Special Regulations as described in the Final Rule.

2.    As provided in the PWC Final Rule, each of those NPS units listed in Table 1 and Table 2 may continue to allow PWC use until April 22, 2002.

3.    After April 22, 2002, all of the units listed in Table 2, as well as Gateway National Recreation Area ("NRA") and Whiskeytown-Shasta-Trinity NRA listed in Table 1, will only authorize PWC use by promulgating Special Regulations as described in the Final Rule. Otherwise, PWC use is prohibited.

4.    After September 15, 2002, Amistad NRA, Bighorn Canyon NRA, Chickasaw National Recreation Unit, Curecanti NRA, Glen Canyon NRA, Lake Mead NRA, Lake Meredith NRA, and Lake Roosevelt NRA will only authorize PWC use by promulgating Special Regulations as described in the Final Rule. Otherwise, PWC use is prohibited. These units may continue to allow PWC use between April 22, 2002 and September 15, 2002.

5.    Any Special Regulation under paragraphs 1 through 4 addressing the continued use of PWCs will be based on appropriate environmental analysis under the National Environmental Policy Act, which analysis will, *inter alia*, consider the impacts of PWC use in the particular unit. Such analysis will evaluate impacts of PWC use including impacts on water quality, air quality, soundscapes, wildlife and wildlife habitat, shoreline vegetation, and visitor conflicts and safety.

6.    Following the execution of this Agreement, the parties agree that their respective counsel will expeditiously prepare, execute, and file with the Court a joint motion for dismissal that dismisses all claims with prejudice, including claims for attorneys fees and other expenses, and a proposed order that incorporates the terms of this Agreement. This Agreement settles all Plaintiffs' claims against Federal Defendants in *Bluewater Network v. Stanton*, 00CV02093 (D.D.C.). In the event there is a dispute over compliance with any term or provision of this

Agreement, the disputing party will notify the other party in writing of the nature of the dispute, and, within 30 days after such notification (or additional time if the parties agree), the parties will discuss and attempt to resolve the dispute. If the parties do not resolve the dispute within 30 days or the extension thereof either party may file a motion asking that the Court enforce the provisions of this Agreement. If a party substantially complies with an enforcement order, the other party may not pursue that matter further in this litigation.

7.     The undersigned representatives of each party certify that they are fully authorized by the parties they represent to execute this Settlement Agreement.

8.     This Settlement Agreement includes and embodies the entire terms and conditions of the agreement between the parties.

9.     Nothing in this agreement may be construed to otherwise limit or modify the discretion accorded to the defendants by the statutes they administer or by general principles of administrative law. Additionally, with the exception of any final agency action to continue use between April 22, 2002 and September 15, 2002, in the units listed in paragraph 4 of this Agreement, nothing in this Settlement Agreement may be construed to limit or modify the right of the plaintiffs to challenge any final agency action taken by the defendants to authorize PWC use beyond the time periods specified in paragraphs 1 through 4. Any lawsuit challenging any final rule issued pursuant to paragraphs 1 through 4, authorizing PWC use by promulgating a Special Regulation as described in the Final Rule, will be filed as a new lawsuit.

10.     Nothing in this Settlement Agreement may be construed to require any of the defendants to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable appropriation law. That notwithstanding, the defendants will make good faith, reasonable efforts to obtain the resources necessary to carry out the terms of this agreement and to have the necessary funds allocated.

11.     Except for the obligation set forth in paragraph 6 to file a Joint Motion to Dismiss this Lawsuit, which shall be filed after this Agreement is executed by the representatives of the parties, the terms of this Agreement shall not take effect until the Court has signed the Order

dismissing with prejudice Plaintiffs' claims against Federal Defendants.

    12.    The defendants agree to pay the plaintiffs $16,500 in full settlement of any and all claims the plaintiffs have for attorneys fees and other expenses in this case.

For plaintiffs Bluewater Network *et al.*


_Daniel Vice_____      Date: __12/20/00__
DANIEL R. VICE (D.C. Bar No. 465905)
HOWARD M. CRYSTAL (D.C. Bar No. 446189)
ERIC R. GLITZENSTEIN (D.C. Bar No. 358287)
Meyer & Glitzenstein
1601 Connecticut Avenue, N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

For Defendants Robert Stanton *et al.*


_____      Date: __12/17/00__
DENIS P. GALVIN
Deputy Director
National Park Service
U.S. Department of the Interior


_____      Date: __12/20/00__
MARTIN J. LALONDE
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0481; -0247

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BLUEWATER NETWORK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 00CV02093 (GK) |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT STANTON, et al., | ) | **FILED** |
| | ) | |
| Defendants. | ) | APR 1 2 2001 |
| | ) | |

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**ORDER**

This matter is before the Court on the joint motion of the plaintiffs and defendants to dismiss with prejudice. Upon consideration of the motion and the entire record in this case, it is hereby:

ORDERED that this case is dismissed with prejudice based on the terms and conditions of the Stipulated Settlement Agreement filed with this Court which is incorporated by reference herein, and that this Court retains jurisdiction solely for enforcement of the Stipulated Settlement Agreement; and it is further

ORDERED that the federal defendants, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), shall pay plaintiffs $16,500, payable to plaintiffs' counsel, as a full, complete and final resolution of any and all claims, demands, rights or causes of action for award of attorneys' fees, litigation costs, or expenses that have or might have been asserted by Plaintiffs in this action; and it is further

April 11, 2001

Gladys Kessler
United States District Judge

31

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Bluewater Network, Friends of the Earth, The Wilderness Society, and Robert Goodman

## DEFENDANTS

Dirk Kempthorne, Secretary, Department of the Interior
Mary Bomar, Director, National Park Service, Department of the Interior

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     88888
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Howard M. Crystal
Eric R. Glitzenstein
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
- ☐ 410 Antitrust

### ○ B. Personal Injury/ Malpractice
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ◉ C. Administrative Agency Review
- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☒ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G. Habeas Corpus / 2255** | ☐ **H. Employment Discrimination** | ☐ **I. FOIA/PRIVACY ACT** | ☐ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ☐ **K. Labor/ERISA (non-employment)** | ☐ **L. Other Civil Rights (non-employment)** | ☐ **M. Contract** | ☐ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original
Proceeding
  ○ 2 Removed
from State
Court
  ○ 3 Remanded from
Appellate Court
  ○ 4 Reinstated
or Reopened
  ○ 5 Transferred from
another district
(specify)
  ○ 6 Multi district
Litigation
  ○ 7 Appeal to
District Judge
from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. S. 706; 16 U.S.C. S. 1; 42 U.S.C. S. 4321

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ | Check YES only if demanded in compla<br>**JURY DEMAND:**  YES ☐  NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒   NO ☐   If yes, please complete related case form.

DATE   5/15/08     SIGNATURE OF ATTORNEY OF RECORD    *[signature]*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.