UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BLUEWATER NETWORK, et al.,          )
                                     )
                    Plaintiffs,      )
                                     )
        v.                           )          No. 08-841 (GK)
                                     )
DIRK KEMPTHORNE, Secretary,          )
Department of the Interior, et al.,  )
                                     )
                    Defendants.      )
_____)

## PLAINTIFFS' RESPONSE TO MOTION TO INTERVENE

Plaintiffs do not oppose the motion to intervene by the Personal Watercraft Industry Association ("PWIA"), American Watercraft Association ("AWA"), and the four additional individuals who have collectively filed a motion to intervene (hereafter "Intervenor Applicants"). However, as explained below, plaintiffs respectfully request that the Court tailor the intervention to serve the interests of judicial economy and insure that the participation of additional parties does not delay or complicate the resolution of this case.

### Background

**I.      Jetskis and The Park Service's Original Approach Toward Regulating Them In National Parks**

Jetskis – also called  personal watercraft ("PWC") – are small, high speed watercraft designed for speed and maneuverability.  Compl. ¶ 18.  Having grown in popularity in recent decades, more than one million Jetskis are in use in the United States today.  Intervenor Proposed Answer ¶ 19.

Jetskis pose significant threats to the unique resources found in the national parks. Compl. ¶ 20.  They disturb shorebirds and marine wildlife; destroy seagrasses and aquatic

vegetation; and degrade the experiences of park visitors seeking natural beauty and soundscapes who experience these loud and polluting vehicles instead.  Id.[1]

More than eight years ago these threats led the National Park Service ("Park Service") to issue a final rule prohibiting Jetskis from all but 21 national park units.  65 Fed. Reg. 15077 (Mar. 21, 2000).  Under the original regulation Jetskis were permitted to continue in the 21 exempt units only for a several year "grace period," after which continued use would have to be authorized through notice and comment rulemaking for some parks, and internal park directive for others.  Id.

Bluewater Network and others sued over these features of the original rule, and the Park Service agreed to settle the suit.  See Bluewater Network v. Stanton, No. 00-2093 (GK) (D.D.C.) ("Bluewater I") (Settlement attached as Exhibit 1 to the Complaint in this action).  Under that Settlement each park may only permit Jetski use to continue through notice and comment rulemaking and full environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq.  Id. ¶¶ 3-4.  Moreover, that NEPA review must be based on an analysis of "the impacts of PWC use in the *particular unit*," including "impacts on water quality, air quality, soundscapes, wildlife and wildlife habitat, shoreline vegetation, and visitor conflicts and safety."  Id. ¶ 5 (emphasis added).  This Court approved the Settlement on April 12, 2001, and retained jurisdiction to enforce its terms.  See Compl., Exhibit 1 at 5.

---

[1]     Intervenor Applicants downplay these concerns by focusing on the transition to 4-stroke Jetski engines.  Int. Mem. at 6-7.  However, the engines – and their noise and pollution – are only one of many problems with these vehicles.  Complaint ¶¶ 18-24.  Moreover, Intervenor Applicants fail to point out that while some parks require 4-stroke snowmobiles, see, e.g., 36 C.F.R. § 7.13(l) (requiring 4-stroke snowmobiles at Yellowstone national park), no park unit that allows Jetskis limits their use to 4-strokes.

In light of the Settlement Agreement, the Court denied PWIA and AWA's motion to intervene in Bluewater I.  See Apr. 11, 2001 Mem. Op. in Bluewater I (Attachment 1).  In particular, the Court explained that the Settlement preserved the proposed intervenors' rights to participate in any Park Service decision-making on Jetskis in individual park units.  Id. at 5.  And as for PWIA and AWA's claimed right to intervene based on their interest "'in protecting the reputation and image of PWCs,'" the Court found that "this claim borders on the frivolous" and could not serve as a basis for intervention.  Id. at 6.

Subsequent to the Settlement Agreement, the Park Service decided that Jetski use is inconsistent with the Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1, as amended, and individual park enabling legislation at certain park units.  Compl. ¶ 29.  For example, in October 2001 the agency decided that in Gulf Islands National Seashore ("Gulf Islands") – a 160 mile stretch of barrier islands in the Gulf of Mexico – Jetski use "poses considerable threats to estuarine flora and fauna . . . and conflicts with the majority of other longstanding uses."  Id.  Accordingly, Jetskis use was banned there.  Id.

At other parks the Park Service decided to consider allowing Jetski use to continue, but was unable to complete the rulemaking process before the expiration of the grace period.  Consequently, the parties entered into a series of Stipulated modifications to the Settlement permitting continued Jetski use at those areas until those processes could be completed.  See, e.g., Bluewater Network v. Mainella, No. 00-2093, Order of May 7, 2003 (granting Stipulated Third Modification to Settlement Agreement).

Finally, at other parks the Park Service simply let the general Jetski ban go into effect after the grace period expired. Thus, for example, the Park Service let the general ban go into effect at Pictured Rocks National Lakeshore ("Pictured Rocks") – 42 miles of Lake Superior shoreline along Michigan's upper peninsula. Compl. ¶ 30. Accordingly, Jetskis were banned in that park unit in April 2002. Id.

## II. The Park Service's Unlawful Reintroduction of Jetskis Into Certain Parks And The Present Suit

Although the adverse impacts of Jetskis have not significantly changed, over the past few years the Park Service has reversed course and issued new regulations authorizing Jetskis in several park units, including both Gulf Islands and Pictured Rocks. 36 C.F.R. §§ 7.12; 7.32 However, in making these new decisions the Park Service neither conducted the requisite site-specific analyses of the adverse impacts of Jetskis on Park resources and values, nor explained why it had changed its views regarding the extent to which Jetskis are inconsistent with those values. Complaint ¶¶ 31-34.[2]

Accordingly, after notifying the Park Service of their concerns, id. ¶ 35, plaintiffs filed this suit seeking to set aside these regulations, and to compel the agency to comply with the Settlement Agreement, NEPA and the Organic Act.

---

[2]    As plaintiffs will explain in detail when this suit reaches the merits, the limitations the Park Service has imposed on some Jetskis – such as the "flat wake requirements" noted by the Intervenor Applicants, Int. Mem. at 8 n.6 – do not meaningfully ameliorate the adverse impacts of Jetski use in these areas.

4

**Discussion**

Plaintiffs do not object to the Intervenor Applicants' appropriate participation in this suit as intervenors.  The individual applicants – whose Jetskis businesses experienced "significant decline" during the prior Jetski bans at Gulf Islands and Pictured Rocks, in light of the significant number of Jetskis in use in these areas, <u>see</u> Declaration of Michael Soder ¶ 5; Declaration of Carmen Perry, ¶ 6 – appear to have the requisite interest in the suit to merit their appropriate participation.

However, by reversing course on Jetski use in these park units with no reasonable explanation, the Park Service does appear to be fully representing the interests of the Intervenor Applicants here.  Accordingly, plaintiffs request that the Court limit the Intervenor Applicants' participation to only those matters as to which they believe they are not being adequately represented.

For example, the Intervenor Applicants are not likely to have grounds to argue about the proper interpretation of the Settlement Agreement, which is at issue in Claim Three of the Complaint.  <u>See</u> Compl. ¶ 44.  To the extent it is necessary to look beyond the plain terms of a Settlement Agreement to discern its meaning (which will not be necessary here in any event), while the interpretation of the settling parties may be relevant, that of a non-party is not.  <u>Mesa Air Group, Inc. v. Department of Transp.,</u> 87 F.3d 498, 503 (D.C. Cir. 1996) ( "[T]he judicial task in construing a contract is to give effect to the mutual intentions of the parties .... Where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties.")

5

Consequently, the Intervenor Applicants should have no role to play in the resolution of Claim Three. Plaintiffs anticipate that once the federal defendants file their merits briefs, it will become apparent that the Intervenor Applicants are adequately represented as to many of the other matters at issue in the litigation as well.

Accordingly, plaintiffs propose that the Court direct that when this case is briefed on summary judgment Intervenor Applicants should file their briefs shortly <u>after</u> the federal defendants, and limit the issues they address to those that they maintain the Park Service has not adequately represented their interests. Such an approach, which courts have adopted in similar cases, <u>see, e.g.</u>, Dec. 2, 1999 Memorandum Order in <u>Defenders of Wildlife v. Norton</u>, No. 99-206 (CKK) (D.D.C.) at 8-11 (attachment 2), will serve judicial economy by insuring that the Court – and the plaintiffs – are not faced with duplicative arguments. In light of the Court's broad authority to limit intervention in the manner the Court deems appropriate, plaintiffs respectfully request that the Court impose these limits in order to confine Intervenor Applicants' participation to those matters as to which they have a legitimate concern, without prejudicing plaintiffs' ability to obtain a timely resolution of their claims. <u>See</u> Fed. R. Civ. P. 24 <u>advisory committee note</u> (1966) (observing that intervention "may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings").

## <u>Conclusion</u>

For the foregoing reasons, plaintiffs respectfully request that should the Court grant intervention, the Intervenors Applicants' participation be appropriately limited to matters as to which Intervenor Applicants are not adequately represented by the federal defendants.

A proposed order is attached.

Respectfully submitted,


  _/s/ Howard M. Crystal_
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206

August 1, 2008                       Attorneys for plaintiffs

<u>Bluewater Network v. Kempthorne</u>
No. 08-841 (GK)

Plaintiffs' Response to Motion to Intervene

ATTACHMENT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BLUEWATER NETWORK, ET AL. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | 00-2093 (GK) |
| ROBERT STANTON, ET AL. | : | |
| | : | |
| Defendants. | : | |
| | : | |

MEMORANDUM-ORDER

I.  Background

On August 31, 2000, Plaintiffs filed this Complaint seeking
declaratory and injunctive relief regarding a Final Rule regulating
the use of personal watercraft ("PWC") in the National Parks
system, issued March 2000 by the National Park Service ("NPS" or
"Service").  The Rule, at 65 Fed. Reg. 15,077 (2000), bans PWCs in
all park units, because of significant air pollution, water
pollution, noise pollution, and harassment of wildlife and park
users.  An exception to the Rule's over-all ban was created for 21
park units where PWC use is the most prevalent.  Those 21 park
units were given a two-year "grace period" during which PWC use
could continue.  After expiration of the two-year grace period,
park superintendents in 10 of those 21 units would be allowed to
unilaterally authorize permanent PWC use by issuance of a park unit
Compendium or directive; park superintendents in the remaining 11

-1-

units would be allowed to authorize permanent PWC use only by issuance of Special Regulations. The Compendium procedure does not provide for any public involvement, whereas the Special Regulation procedure involves a public notice and comment rulemaking process.

Soon after the Complaint was filed, the parties initiated settlement discussions. By mid-November the parties were successfully concluding their discussions, and on December 20, 2000, they filed a Joint Motion for Approval of Settlement Agreement and Dismissal with Prejudice.

On November 15, 2000, the Personal Watercraft Industry Association ("PWIA") and the American Watercraft Association ("AWA") moved to intervene. The PWIA is composed of companies that manufacture or distribute PWCs, and the AWA is composed of PWC owners, riders and users. The PWIA and the AWA (collectively, "Proposed Intervenors") were aware of this lawsuit from the day it was filed since on that day they issued a press release criticizing the relief it sought. See Pls' Mem. In Opp. To Joint Mot. to Intervene, Ex. A.

## II.  Analysis

The issue now before the Court is whether intervention is warranted under either Fed. R. Civ. P. 24(a) or (b). The Court concludes that it is not.

In order to intervene as of right under Fed.R.Civ.P.24(a), Proposed Intervenors must demonstrate "an interest relating to the

property or transaction which is the subject of the action." In particular, they must identify "a legally protectable" interest and demonstrate that they have standing to intervene because of injury to that interest.   Southern Christian Leadership Conference v. Kelley, 747 F.2d 777, 779 (D.C. Cir. 1984).

In evaluating whether the Settlement Agreement now before the Court "works a practical impairment of appellants' interests", Natural Resources Defense Council v. Costle, 561 F.2d 904, 908, (D.C. Cir. 1977), it is necessary to focus on precisely what the Settlement Agreement does and does not do.

First, the Rule banned PWCs in all but 21 units of the National Park system; the Agreement makes no change in that ban.

Second, the Rule allowed PWCs in the remaining 21 units for a period of two years; the Agreement extends that grace period from two years to two years and almost five months in eight of the ten park units where the Rule allowed PWC use by virtue of the Park Superintendent Compendium process.

Third, in the remaining 21 units, the Rule allowed permanent utilization of PWCs by either issuance of a Park Superintendent's Compendium (or directive) in ten of the units, or by issuance of Special Regulations in the other 11 units.  Under the Agreement, PWC use may now only be authorized by issuance of Special Regulations and those Special Regulations must be based on an appropriate analysis and public participation as mandated by the

-3-

National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4332 et seq.

In short, it is apparent that the Settlement Agreement leaves intact the basic structure and substance of the Rule issued by NPS. The ban on PWCs in all but 21 park units remains in place; and the grace period for those 21 units remains in place, with a short extension of the grace period for 8 of the 21 units. The Agreement makes only two changes to the process by which PWC use may be authorized in those 21 units: it removes the unilateral power of the Park Superintendent to allow PWC use in ten of those units, and it requires that the Special Regulation procedure (based on a NEPA analysis and greater public involvement) be used in all 21 park units if they are to continue to permit PWC use.

Proposed Intervenors declare that two of their "interests" will be injured by the Settlement Agreement. They claim that they "benefit from the two-year grace period and the Rule's provisions that provide NPS the flexibility to permit PWC use to continue in National Park areas in the future where it determines that such use is appropriate". As to the two-year grace period, Proposed Intervenors can only benefit from the Settlement Agreement since it somewhat lengthens the Rule's original grace period. As to the "flexibility" for certain park units to allow continued PWC use, what Proposed Intervenors are really complaining about is the elimination of total control by the Park Superintendent and the

-4-

requirement that continued PWC use be conditioned on a rulemaking process which requires a NEPA analysis and public notice and comment (in which they may of course participate). However, Proposed Intervenors have no legally protectable interest in avoiding the imposition of such an open, fair, and accountable process. The Government is correct that "the Agreement embodies nothing more than processes in which the right of the intervenor-applicants to be full participants is fully preserved" and that therefore, there is no reason for them to object to the settlement. Defs.' Response to Joint Mot. to Intervene at 3; See Mayfield v. Barr, 985 F.2d 1090, 1093 (D.C. Cir. 1993) ("those who fully preserve their legal rights cannot challenge an order approving a[] [settlement] agreement resolving the legal rights of others").[1]

---

[1] Proposed Intervenors rely heavily on several environmental cases from this Circuit in which intervention was allowed. In fact, those cases are all distinguishable.

In Military Toxics Project v. Environmental Protection Agency, 146 F.3d 948, 954 (D.C. Cir. 1998), intervention was granted because "all parties agree that the CMA has standing because some of its members produce military munitions and operate military firing ranges regulated under the Military Munitions Rule . . . These CMA members would suffer concrete injury if the court grants the relief the petitioners seek; they would therefore have standing to intervene in their own right, and we agree with the litigants that the CMA has standing to intervene on their behalf in support of the EPA." Obviously that is not the case here.

In Natural Resources Defense Council v. United States Environmental Protection Agency, 99 F.R.D. 607, 609 (D.D.C. 1983), pesticide manufacturers and industry representatives were allowed to intervene in a suit seeking to, inter alia, set aside a series of EPA regulatory decisions. Intervention was allowed because "[i]f plaintiffs succeed in this case, these regulatory decisions, which are obviously in the intervenors' interests, will be set aside. Thus, the intervenors can be said to have a substantial and

-5-

The second interest that Proposed Intervenors assert will be injured by the Settlement Agreement is "in protecting the reputation and image of PWCs". This claim borders on the frivolous and hardly constitutes the "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical" injury necessary to support a finding of standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

In order to be granted permissive intervention under Rule 24(b), the court, in exercising its discretion, "shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Given the

---

direct interest in the subject of this litigation." The present case offers no such possibility since neither the Complaint nor the Settlement Agreement contemplate setting aside any particular substantive decisions.

Finally, in Costle, 561 F.2d at 907-911, the Court of Appeals allowed intervention in a district court proceeding which involved on-going implementation and oversight of a very complex settlement agreement obligating EPA to initiate and complete, rule-making proceedings for the regulation of certain named pollutants on an industry-by-industry basis. The agreement contained timetables and priorities for adopting the regulations which would, in turn, establish effluent limitations and guidelines, new source standards of performance, and pretreatment standards for each industrial category. Even though intervenors could ultimately obtain appellate review of the substance of the regulations, the Court of Appeals ruled that, as a practical matter, intervenors' interests could be impaired because of the extensive involvement of the district court in post-settlement implementation of the settlement agreement. That is simply not the case here. There is no similarity in the complexity of the two agreements. There is no contemplation that this Court will provide ongoing oversight and monitoring of the Settlement Agreement or review decisions of the Park Service about implementation of the Special Regulations procedure.

-6-

procedural posture of this case, namely that the parties have reached a process-based settlement that in no way impacts or impairs any of Proposed Intervenors' substantive rights,[2] the Court sees no good reason to allow intervention which will only delay resolution of the case and may, very possibly, thwart a settlement that parties have worked diligently to craft.

For all the foregoing reasons, the Joint Motion to Intervene is **denied**.

_April 11, 2001_
Date

_Gladys Kessler_
Gladys Kessler
United States District Judge

---

[2] The Court again emphasizes that the Settlement Agreement does not impair the right of Proposed Intervenors, or Plaintiffs for that matter, to challenge any final decisions about PWC use made by the Park Service pursuant to the procedures established in the Agreement, or to participate fully in that decision-making process.

<u>Bluewater Network v. Kempthorne</u>
No. 08-841 (GK)

Plaintiffs' Response to Motion to Intervene

ATTACHMENT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE, *et al.*,

    Plaintiffs,

      v.

BRUCE BABBITT, *et al.*,

    Defendants.

Civil Action No. 99-206 (CKK)

("Atlantic Salmon I")

**FILED**

DEC - 2 1999

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TROUT UNLIMITED, *et al.*,

    Plaintiffs,

      v.

BRUCE BABBITT, *et al.*,

    Defendants.

Civil Action No. 99-2143 (CKK)

("Atlantic Salmon II")

**MEMORANDUM ORDER**

Two parties, the State of Maine ("Maine"), and the Maine Wild Blueberry Commission ("the Commission"), have moved to intervene as defendants and cross-claimants in the first of the above-captioned cases, which were consolidated on October 12, 1999.[1]  Both Plaintiffs and

---

[1]Several additional parties also moved collectively to intervene, but have since withdrawn their motion. *See* Maine Pulp & Paper Ass'n *et. al*, Mot. to Withdraw Mot. to Intervene, filed September 28, 1999, and granted October 4, 1999.  Whereas these parties retreated from their earlier attempts to intervene, Maine has invested its attempts with an escalating sense of urgency. As of October 26, 1999, Maine pointed the Court toward new exigencies requiring resolution of the matter of its proposed intervention.  In essence, recent indications that the Secretary intended to reinitiate the listing process, in response to a status review of the salmon suggesting that their plight had grown even more dire since 1997, have, in Maine's view, rendered its arguments for

Defendants have opposed these motions.[2]  Pursuant to Federal Rules of Civil Procedure 24(a)

and (b), a nonparty may petition the Court to intervene in an action either as of right or

permissively.  Because the Court finds that Maine has made a sufficient showing for intervention

as of right with respect to one of the two claims at issue in the instant case, the Court shall grant

Maine's motion as to Claim Two of Plaintiffs' Complaint to the extent Maine's interest in that

Claim is not adequately represented by Defendants.   In accepting Maine's limited intervention,

the Court makes no ruling on Maine's Cross-Claim, but reserves judgment until Defendants have

had an opportunity to respond.  The Commission, however, has failed to persuade the Court that

its presence in this litigation is warranted, and therefore may not intervene as of right.  Moreover,

since the Commission promises to contribute a perspective that already finds sufficient

representation by Maine, the Court shall, within the discretion afforded it by Federal Rule of

Civil Procedure 24(b), decline to grant the Commission permission to intervene.

Congress enacted the Endangered Species Act of 1973 ("ESA"), 87 Stat. 884, as amended

16 U.S.C. § 1531 *et seq.*, "to provide a means whereby the ecosystems upon which endangered

species and threatened species depend may be conserved, [and] to provide a program for the

conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).  The

ESA consigns to the Secretary of the Interior and the Secretary of Commerce the authority to list

a species as endangered or threatened, although any interested party may petition the Secretary to

---

intervention even more compelling. *See* Mot. for Ruling on Maine's Mot. to Intervene.

[2]Defendants, however, have since "clarified" their position on Maine's proposed intervention,
essentially disavowing their initial opposition except with respect to Maine's Cross-Claim. *See*
Defs.' Notice of Clarification, filed Oct. 8, 1999.

initiate the listing process or to remove a listed species. 16 U.S.C. §§ 1532-33. While the

process of listing and implementing measures to ensure the survival of endangered or threatened

species under the ESA consists of several steps, only the initial listing decision is at issue here.

Pursuant to section 1533, the listing decision must transpire

> solely on the basis of the best scientific and commercial data available to [the
> Secretary] after conducting a review of the status of the species and after taking
> into account those efforts, if any, being made by any State or foreign nation, or
> any political subdivision of a State or foreign nation, to protect such species,
> whether by predator control, protection of habitat and food supply, or other
> conservation practices, within any area under its jurisdiction, or on the high seas.

16 U.S.C. § 1533(b)(1)(A). In other words, this decision must be predicated solely on factors

relating to the status of the species and extant efforts, if any, to protect that species. Economic

and other factors may not shape the listing decision. *See Tennessee Valley Authority v. Hill*, 437

U.S. 153, 184-88 (1978); *Spotted Owl v. Hodel*, 716 F. Supp. 479, 480 (W.D. Wash. 1988). *See*

*also* H.R. Conf. Rep. No. 835, 97th Cong. 2d Sess. 19, 20 (1982) ("[E]conomic considerations

have no relevance to determinations regarding the status of species."). Accordingly, the

Secretary must decide whether or not to list a species under the ESA "without reference to

possible economic or other impacts of such a determination." 50 C.F.R. § 424.11(b).

   After publishing the proposed rule in the Federal Register for "notice and comment," the

Secretary must within one year issue a final rule or decide to withdraw the proposed rule;

otherwise he or she may extend the one-year period for consideration by not more than six

months. *See* 16 U.S.C. § 1533(b)(6)(B)(i). If the Secretary determines, however, that "any

emergency posing a significant risk to the well-being of any species" has arisen, he or she may

issue temporary listing regulations, or emergency regulations, that take effect immediately. 16

U.S.C. § 1533(b)(7).

The facts behind these cases require only a cursory review for the purpose of considering these motions. In response to a 1993 petition to list the Atlantic salmon throughout the United States, the National Marine Fisheries Service and the United States Fish and Wildlife Service ("the Services") initiated an evaluation of the salmon population and determined that listing was unnecessary for the population as a whole. But the Services also found that a "distinct population segment" of Atlantic salmon that inhabited seven rivers in Maine ("Seven Rivers DPS") appeared to meet the listing criteria for a threatened species, and subsequently published a proposed rule to which they invited comment. In response to this proposal, Maine developed its own conservation plan, and in December of 1997 the Services withdrew the proposed listing of the Seven Rivers DPS. Plaintiffs brought this action challenging both the 1997 withdrawal *and* the Services' ongoing decision not to issue an emergency listing. *See* Compl. ¶¶ 75-76.

Under Federal Rule of Civil Procedure 24(a)(2), a nonparty may apply to intervene in an action as of right. The Rule provides, in relevant part:

> Upon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by the existing parties.

Fed. R. Civ. P. 24(a)(2). This Circuit recognizes four requirements for intervention of right: (1) timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) lack of adequate representation by existing parties. *See Williams & Humbert, Ltd. v. W & H. Trade Marks, Ltd.,* 840 F.2d 72, 74 (D.C. Cir. 1988); *see also Dimond v. District of Columbia,* 792 F.2d 179, 192

4

(D.C. Cir. 1986); *People for the Ethical Treatment of Animals, et al. v. Babbitt*, 151 F.R.D. 6, 7

(D.D.C. 1993).  The Court of Appeals has described the interest test under Rule 24(a)(2) as

"primarily a practical guide to disposing of lawsuits by involving as many apparently concerned

persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700

(D.C.Cir. 1967); *see also Huron Environmental Activist League v. EPA*, 917 F. Supp. 34 (D.D.C.

1996).

      The Court shall consider first Maine's Motion to Intervene, and then the Commission's.

"Whether a motion to intervene is timely made is 'to be determined from all the circumstances,

including the purpose for which intervention is sought . . . and the improbability of prejudice to

those already in the case.' *Foster v. Gueory et al.*, 655 F.2d 1319, 1324 (D.C. Cir. 1981)

(quoting *Natural Resources Defense Council v. Costle*, 561 F.2d 904, 907 (D.C. Cir.1977)).

Maine moved to intervene into Atlantic Salmon I within two months after Plaintiffs filed their

original complaint.  In light of the circumstances and this prompt action on Maine's part, the

Court finds Maine's motion to be timely.[3]

      Maine has articulated three interests in support of its motion: an interest in conserving its

own wildlife; an interest in maintaining a viable economy and in preserving the welfare of its

citizens; and an interest, embodied in its proposed cross-claim, in challenging the designation of

salmon found within the seven Maine rivers as a distinct population segment.  *See* Mot. to

---

[3]Defendants originally challenged the timeliness of this motion on the grounds that they had
answered the Complaint (although they had not yet done so when Maine filed its motion), and,
more significantly, that they anticipated that Maine's cross-claims would unduly delay this
litigation.  *See* Def.'s Opp. to Maine's Mot. to Intervene at 8.  The Court does not agree.
Moreover, in light of Defendants' clarified position on the issue of Maine's intervention, this
challenge no longer bears any force.

Intervene at 6–7; Maine's Reply to Def.'s Opp. to Maine's Mot. to Intervene at 4. Both parties

have argued that the economic interests to which Maine points are of no consequence to the

listing process at issue in this case.[4] *See* Pls.' Opp. to Maine's Mot. to Intervene at 8-12; Defs.'

Opp. to Maine's Mot. to Intervene at 10. Indeed, Maine itself concedes that evidence of

economic harm may play no part in a Secretary's listing decision. *See* Maine's Mot. to Intervene

at 7. Although neither this Circuit nor any other has ruled on this issue of whether a State's

economic interests warrant intervention as of right in an ESA listing case,[5] one District Court has

considered an analogous issue. In *Friends of the Wild Swan, Inc., et al. v. U.S. Fish and Wildlife

Service, et al.*, 896 F. Supp. 1025 (D. Or. 1995), an Oregon District Court held that proposed

intervenors could not intervene as of right in a case challenging a decision not to list bull trout as

an endangered species. *See id.* at 1028. These proposed intervenors advanced solely economic

interests which, the Court observed, did not constitute part of the administrative record under

review, and thus they could not demonstrate the "legally protectable interests" necessary for

intervention under Rule 24(a)(2). *Id.* at 1027.

   While Maine's expressed economic interests are not cognizable in the context of either

Defendants' 1997 decision to withdraw their proposed listing of the seven rivers Atlantic salmon

---

[4]In Maine's account, a decision to list the salmon under the ESA would have devastating consequences for Maine's economy and, in turn, for the welfare of its citizens. *See* Maine's Mot. for Ruling at 3-4 ("A listing will severely and adversely affect three industries critical to Maine and its citizens–forestry, agriculture, and aquiculture.")

[5]This Circuit has commented that "Congress clearly did not adopt the ESA for the purpose of protectinge economic interests . . . ." *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1237 (D.C. Cir. 1996). As that case recognized, though, economic interests do become significant at the stage in the listing process when the Secretary designates critical habitats and their concomitant protections. *See id.*

6

or their previous and current decisions not to issue an emergency listing of the salmon, however, Maine has articulated an interest in participating in the oversight of its natural resources. This interest certainly faces impairment under the remedy Plaintiffs seek in Claim Two of their Complaint—an injunction compelling Defendants to issue an emergency listing pending the implementation of protective measures at the ultimate listing stage. *See* Compl. ¶ 76; 16 U.S.C. § 1533(b)(7). Such an interim measure would require Maine and the Services to implement immediate regulations to protect the salmon which could remain in effect for up to 240 days, and in which Maine would have no say.[6] *See* 16 U.S.C. § 1533(b)(7). Should the Court determine that such injunctive relief is warranted, Maine's interest in overseeing its own natural resources would encounter immediate jeopardy. Unlike the conventional listing process, which requires a notice and comment stage affording Maine the opportunity for input and dissent, the emergency process provides no venue for Maine to voice its concerns.

If, on the other hand, the Court determines only that Defendants' 1997 decision to withdraw the proposed listing was arbitrary and capricious, then the sole available remedy is for the Court to remand to the agency for further consideration. This Circuit recently reminded us that, "[w]hether it is a court of appeals or a district court, '[u]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards.'" *County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999) (quoting *PPG Indus. v. United States*, 52 F.3d 363 (D.C. Cir. 1995)).

---

[6]The statute does, however, require that the Secretary provide reasons for and notice of such regulations. *See* 16 U.S.C. § 1533(7)(A) and (B).

7

Under a scenario in which the Secretary decides to reinitiate the formal listing process for the

Seven Rivers DPS, Maine will enjoy considerable opportunities to be heard on all issues relevant

to its interests.[7]

Moreover, the Court finds that, notwithstanding the minimal showing required to meet

the burden of establishing that a proposed intervenor's interests will not be represented

adequately by existing parties, *see Trbovich v. United Mine Workers of America*, 404 U.S. 528,

538 n.10 (1972), Maine has failed to advance a colorable argument to suggest that Defendants

will not vigorously defend their decision to withdraw the proposed listing in 1997. Here Maine's

burden is slightly more onerous given that "a presumption of adequate representation generally

arises when the representative is a governmental body or officer charged by law with

representing the interests of the absentee." *Pennsylvania v. Rizzo*, 530 F.2d 501, 505 (3d Cir.),

*cert. denied*, 426 U.S. 921, 96. With respect to Claim Two and the injunctive relief it seeks,

---

[7]Maine has amply demonstrated its appreciation of the difference between the conventional listing process–at issue in the 1997 decision–and the emergency listing process. In its recent motion requesting this Court to rule on its Motion to Intervene, Maine declared that

> [t]he issue of whether there is an emergency listing or simply an initiation of the listing process is of vital significance to Maine. . . . In short, an initiation of the administrative process would provide Maine with a full opportunity to be heard. If, however, Maine is not allowed to intervene, and plaintiffs follow through on their stated intent to seek an emergency listing, Maine will have no opportunity to be heard.

Mot. for Ruling on Mot. to Intervene at 2-3. Indeed, the Court notes that the escalating urgency surrounding Maine's attempt to intervene in this action derives from Maine's apparent fear that settlement discussions between Plaintiffs and Defendants might result in an immediate emergency listing of the Seven Rivers DPS salmon. No indication of such an outcome has, to the Court's knowledge, emerged thus far; nonetheless, Maine seems especially eager to derail settlement discussions that it perceives as detrimental to its own interests. The Court emphasizes, though, that Maine's fears have not yet come to fruition.

8

though, the Court agrees with the Ninth Circuit's analysis to the extent that the Federal

Defendants here are "not charged with a duty to represent [Maine's] asserted interests in

defending against the issuance of an injunction." *Forest Conservation Council v. U.S. Forest*

*Service*, 66 F.3d 1489, 1499 (9th Cir. 1995) (permitting intervention by the State of Arizona and

Apache County in an action seeking injunctive relief for alleged violations by the United States

Forest  Service of the National Environmental Policy Act and the National Forest Management

Act).  Accordingly, with respect to Claim Two and the injunctive relief it seeks, Maine has

advanced a cognizable interest, potentially impaired under the disposition of this case, that

remains inadequately represented by the existing parties.[8]   To the extent that Defendants have

maintained, thus far, that no emergency listing is warranted, they clearly remain capable of

defending their own decision.[9]  The Court sees no need for duplicative arguments from Maine

justifying aspects of this decision that Defendants are best situated to defend.  If this situation

changes and Defendants suggest a willingness to engage in emergency listing procedures,

however, the Court can adjust the extent of Maine's role in defending against this course of

action.  Finally, the Court reminds the parties that it shall make no ruling on Maine's Cross-

---

[8]Courts need not consider a motion to intervene as an all-or-nothing proposition, but may limit intervention to issues in which a nonparty demonstrates a sufficient interest, potential impairment of that interest, and inadequate representation by existing parties. *See Forest Conservation Council v. U.S. Forest Service*, 66 F.3d 1489, 1495-96 (9th Cir. 1995); *United States v. South Florida Water Management Dist.*, 922 F.2d 704, 707 & n.4 (11th Cir. 1991); *Portland Audubon Soc'y v. Hodel*, 866 F.2d 302, 304 (9th Cir. 1989).

[9]Although Defendants recently filed with the Court a copy of a proposed rule for affording endangered status for the Seven Rivers DPS, published in the Federal Register on November 17, 1999, see 64 Fed. Reg. 62627 (1999), they have given no indication that they intend to take additional emergency action.  In addition, the Court notes that this filing performed an informational function, but had no effect on the two claims currently being litigated.

Claim until such time as Defendants respond.

In light of the Court's ruling on Maine's Motion to Intervene, granting it in limited fashion as to Claim Two and denying it as to Claim One of the Complaint, the Court can conceive of no convincing argument for the Commission's intervention, either as of right or permissive. To the extent that the Commission's asserted interests are either ancillary to the subject of this litigation, or economic in nature, *see* Commission's Mot. to Intervene at 8 ("The interests of the Commission in this litigation are two-fold: (1) to protect its interest in the development and implementation of the Conservation Plan; and (2) to ensure the continued growth and economic viability of Maine's wild blueberry industry."), they fail to meet the criteria of Rule 24(a)(2). Maine, now an Intervenor-Defendant and Cross-Claimant, more than adequately represents the Commission's interests for the purpose of Claim Two and its Cross-Claim, which is identical to that of Maine. Thus, the Court sees no advantage to granting the Commission permissive intervention.

It is therefore, this __30__ day of November, 1999, hereby

**ORDERED** that Maine's Motion to Intervene as Defendant and Cross-Claimant [#4] is GRANTED as to Claim Two of the Complain to the extent Maine's interest is not adequately represented by Defendants, and DENIED as to Claim One of the Complaint; and it is further

**ORDERED** that Defendants shall respond to Maine's Cross-Claim by January 31, 2000; and it is further

**ORDERED** that Maine shall wait until two weeks after the parties have fully briefed their Cross-Motions for Summary Judgment, such briefing scheduled to conclude on December 21, 1999, to brief those aspects of Claim Two for which Defendants do not adequately represent

Maine's interests; and it is further

ORDERED that the Maine Wild Blueberry Commission's Motion to Intervene as

Defendant and Cross-Claimant [#17] is DENIED in full.

SO ORDERED.

COLLEEN KOLLAR-KOTELLY
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BLUEWATER NETWORK, et al.,          )
                                    )
              Plaintiffs,           )
                                    )
       v.                           )        No. 08-841 (GK)
                                    )
DIRK KEMPTHORNE, Secretary,         )
Department of the Interior, et al., )
                                    )
Defendants.                         )
_____)

ORDER

Upon consideration of the motion of the Personal Watercraft Industry Association ("PWIA"), American Watercraft Association ("AWA"), and four additional individuals to intervene, the response thereto, and the entire record herein, it is hereby ORDERED that the motion is GRANTED to the extent the intervenors' interests are not adequately represented by the federal defendants. Accordingly, the parties' briefing schedule should include an opportunity for the intervenors to file a brief after the federal defendants, solely addressing matters as to which the intervenors contend that the federal defendants are not adequately representing their interests.

_____
U.S. District Judge