**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BLUEWATER NETWORK, <u>et al.</u>, )<br>)<br>    Plaintiffs, )<br>)<br>    v. )<br>)<br>KENNETH SALAZAR,[1] <u>et al.</u>, )<br>)<br>    Defendants, )<br>)<br>PERSONAL WATERCRAFT INDUSTRY )<br>ASSOCIATION, <u>et al.</u>, )<br>)<br>    Defendant-Intervenors. )<br>)| Civil Action No. 08-841 (GK) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Bluewater Network, The Wilderness Society, Enid Sisskin, and Robert Goodman (collectively, "Plaintiffs") brought this action against Kenneth Salazar, Secretary of the Department of the Interior, and Daniel Wenk, Deputy Director of the National Park Service ("NPS") (collectively, "Defendants"). Shortly after the Complaint was filed, six parties--Personal Watercraft Industry Association, American Watercraft Association, Carmen Perry, Richard Chenoweth, Michael Soder, and William Manson--were added as Defendant-Intervenors (collectively, "Intervenors"). Plaintiffs seek to ban the re-introduction of personal watercraft ("PWCs" or "jetskis") in two national parks--Gulf Islands National Seashore ("Gulf Islands" or "GUIS") along the Gulf Coast of Florida and

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Secretary of the Interior Kenneth L. Salazar is automatically substituted as defendant for former Secretary Dirk Kempthorne.

Mississipi and Pictured Rocks National Lakeshore ("Pictured Rocks" or "PIRO") in Michigan.

Plaintiffs challenge Defendants' actions pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. Specifically, they argue that NPS' decision to allow jetskis back into these two parks after banning them under both a national rule and park-specific decisions represents arbitrary and capricious conduct under the APA. Further, Plaintiffs maintain that the decisions run afoul of the National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1 et seq., violate the procedural requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the terms of a settlement agreement ("Settlement Agreement" or "Agreement") entered into by parties subsequent to an earlier round of litigation involving these two parks. Bluewater Network v. Stanton, Civ. No. 00-02093 ("Bluewater I").

Bluewater contends that the Environmental Assessments ("EA") prepared by NPS to analyze the impacts of PWCs in each park unreasonably concluded that jetski use is permissible. Further, they take issue with the agency's "findings of no significant impact" ("FONSI"), the final Rule promulgated for each park, each of which agreed with the EAs' conclusions that PWC use would not impair GUIS or PIRO, and the resulting lifting of the ban on operating PWCs in the parks.

Plaintiffs filed this case on May 15, 2008, challenging the re-introduction of PWCs into PIRO and GUIS. Intervenors--six individuals and organizations "with direct and substantial organizational, financial, and personal interest in maintaining existing authorized PWC use in these two park units," Mot. to Intervene at 1 [Dkt. No. 8]--were added as Defendants on August 19, 2008. Order (Aug. 19, 2008). Intervenors filed a Motion for Partial Summary Judgment ("Standing Mot.") on October 15, 2008, which challenged Plaintiffs' standing to object to the Rule at Pictured Rocks. [Dkt. No. 18]. Those arguments were incorporated into their Motion for Summary Judgment ("Intervenors' Mot.") [Dkt. No. 27], filed February 2, 2009. Intervenors' Motion became ripe on March 20, 2009. Plaintiffs also filed a Motion for Summary Judgment [Dkt. No. 24], on December 18, 2008, which became ripe February 27, 2009. Finally, the original Defendants filed their own Motion for Summary Judgment ("Defs.' Mot.") [Dkt. No. 29] on February 6, 2009, which became ripe on March 20, 2009. Parties presented oral arguments at a Motions Hearing on May 17, 2010.

Upon consideration of the Motions, Oppositions, Replies, lengthy oral argument, and the entire record herein, and for the reasons stated below, Intervenors' Standing Motion for Partial Summary Judgment is **granted in part and denied in part**, Plaintiffs' Motion for Summary Judgment is **granted in part and denied in part**, Defendants' Motion for Summary Judgment is **granted in part and**

**denied in part**, and Intervenors' Motion for Summary Judgment is **granted in part and denied in part**.

In reaching these conclusions, the Court has examined in detail NPS' reasoning and how it arrived at the conclusions it reached, in light of the factual premises relied upon. In particular, the Court has asked whether NPS examined the relevant data and if it provided a rational and logical connection between the facts found and the policy choices made. But even apart from this probing, in-depth review, this case presents an additional overarching question. Why has NPS issued Rules allowing jetski use in two beautiful and pristine national parks, acknowledging that such use will impact, to varying degrees, water quality, air quality, wildlife, animal habitats, soundscapes, visitor use and safety, etc., when the users of jetskis are perfectly free to enjoy their vehicles in other, equally accessible areas, without threatening the serenity, the tranquility--indeed, the majesty--of these two national treasures?

## I.  BACKGROUND[2]

Jetskis are "high performance vessels designed for speed and maneuverability and are often used to perform stunt-like

---

[2]     Unless otherwise noted, the facts set forth herein are drawn from the Administrative Record ("AR").  On October 14, 2008, parties submitted the bates-stamped AR in electronic form.  [Dkt. No. 17.]  The voluminous record spans two compact discs, one for each park.  Citations to the AR for Pictured Rocks will appear as PIRO-#####; citations to the AR for Gulf Islands will appear as GUIS-#####.

maneuvers." 65 Fed. Reg. 15,078. Their "rapid maneuvering and frequent speed changes" cause the engine speed to "rise[] and fall[]," which creates a sound whose pitch varies. GUIS-00174; see PIRO-00024. According to NPS, "this constantly changing sound is often perceived as more disturbing than the constant sound from motorboats." Id. Plaintiffs cite studies showing that such noise significantly mars visitors' experience of the parks. Pls.' Mot. at 8. The EAs acknowledge that PWCs can "disrupt the 'passive' experience of park resources and values." GUIS-00174; PIRO-00024. Improvements to engine technology--including transition from two-stroke engines to four-stroke and direct-injection two-stroke engines--are expected to reduce PWCs' impacts on noise and pollution. Id. at 00172-74; PIRO-00023-24.

Historically, PWCs have been permitted in the National Park System. In the 1990s, however, PWC use began to increase. In response, NPS proposed a rule ("National Jetski Rule") in 1998, which became final on March 21, 2000, banning PWC use in all parks except 21 parks with a history of prior jetski use. 65 Fed. Reg. 15,077-080; 36 C.F.R. § 3.9. These 21 excepted parks, which include the two parks at issue in this case, were given a two-year grace period to develop and implement park-specific regulations that would allow PWC use;[3] if they decided not to take any action,

_____

[3] Initially, under the National Jetski Rule, PWC use in ten of the 21 excepted parks, including GUIS, could continue, (continued...)

the ban would go into effect upon expiration of the grace period on April 22, 2002. 65 Fed. Reg. at 15,078.

After the National Jetski Rule was issued, Bluewater Network and other environmental groups became concerned that the Rule was not sufficiently protective of the 21 excepted parks.[4] Defs.' Mot. at 3. They brought suit against NPS, which resulted in the Settlement Agreement approved by this Court on April 11, 2001. Bluewater I, Order (Apr. 11, 2001). Under the terms of the Settlement Agreement, if a park excepted from the national ban wished to permit PWC use after expiration of the grace period, it was required to promulgate a park-specific regulation on PWC use. Defs.' Mot. at 3-4. For such parks, the national ban would continue to apply from expiration of the grace period on April 22, 2002, until issuance of a park-specific regulation allowing PWC use if such Rule was issued. The Agreement also required parks permitting PWC use to comply with NEPA.

---

[3] (...continued)
restricted only to the level authorized in each park's Superintendent's Compendium. However, as part of the Settlement Agreement in Bluewater I, NPS was required to engage in park-specific rulemaking on all parks not included under the national ban. Settlement Agreement at ¶¶ 3-4 (Ex. 6 to Pls.' Mot. for Summ. J. ("Pls.' Mot.")) [Dkt. No. 24-6].

[4] Plaintiff Robert Goodman was also a plaintiff in Bluewater I.

## A. Pictured Rocks National Lakeshore

Pictured Rocks is located along the southern shore of Lake Superior in the north-central section of Michigan's Upper Peninsula.  The surrounding region is a "sparsely populated area" of the Peninsula.  PIRO-00021.  In the Pictured Rocks EA, Defendants describe the park as a "year-round recreational destination where hiking, camping, hunting, nature study, and winter activities abound."  Id. at 00015.  The park features "multicolored sandstone cliffs, beaches, sand dunes, waterfalls, inland lakes, wildlife and forested shoreline" as well as "a lighthouse . . . former Coast Guard life-saving stations . . . old farmsteads and orchards." Id.

In NPS' own words, the park is significant because in part its "shoreline offers extraordinary and inspirational scenic vistas of Lake Superior, the largest body of surface area of fresh water on earth."  Id. at 00021.  Additionally, PIRO boasts rock cliffs "unmatched in their scenic value," "[t]welve miles of unspoiled and undeveloped . . . beach," and "a spectrum of cultural resources," among other unique attractions.  Id.

PWC use was first permitted in the park around 1990.  In the past, PWCs were permitted along the entire shoreline of the park, but only within a quarter-mile boundary of the shore, and were regulated in the same manner as other motorized watercraft.  In 1998, Michigan passed the Michigan Personal Watercraft Safety Act.

MICH. COMP. LAWS § 324.80209 (1998). That statute imposes wake, location, and depth restrictions on PWC use throughout the state. NPS incorporates the statute's provisions into its policies governing PWC use at Pictured Rocks. PIRO-00034. The Michigan legislation requires PWCs to travel at slow, no-wake speeds within 200 feet of shoreline, and refrain from traveling within 100 feet of "a dock, raft, or buoyed or occupied bathing or swimming area, a person in the water or on the water in a personal flotation device, or a vessel moored, anchored, drifting, or sitting in dead water," unless traveling at no-wake speed. Id. There are additional restrictions regarding proximity to divers and diving vessels.[5] Id.

After the National Jetski Rule was promulgated in 2000, PIRO was given a two-year grace period to develop a park-specific rule governing PWC use. On February 7, 2002, Park Superintendent Karen C. Gustin issued a Compendium ("Superintendent's Compendium")[6]

---

[5]     Further, the Environmental Assessment prepared for PIRO states that other state regulations apply, including: operation of PWCs only between 8:00 a.m. and one hour before sunset; age restrictions; prohibited use where water is less than two feet deep, unless traveling at a no-wake speed; a ban on operation within 150 feet of other watercraft; and regulation of "speed, wake jumping, and other action." PIRO-00034.

[6]     The Superintendent's Compendium has been described by NPS as a "local management guide authorized by" NPS regulations, 71 Fed. Reg. 17,780 (Apr. 7, 2006), and is considered to be "terminology the NPS uses to describe the authority provided to the Superintendent under [applicable NPS regulations]. It allows for local, park-specific regulations for a variety of issues and under
(continued...)

closing the park to all PWC use.  PIRO-03615 (Ex. 3 to Pls.' Mot.).  Consequently, as provided for in the National Rule, when the grace period expired in April 2002, PWCs were banned at PIRO.

That same year, 2002, NPS conducted an Environmental Assessment ("EA") to analyze the impact of PWCs on the park.  The EA considered three alternatives: Alternative A examined PWC use at the same level that existed before the national ban; Alternative B examined limited PWC use; and Alternative C, the no-action alternative, examined the impact of prohibiting all PWC use at PIRO.

Guided by Director's Order #12: Conservation Planning, Environmental Impact Analysis and Decision-making, NPS analyzed the impacts of each alternative on park resources in terms of their context, duration, and intensity.  PIRO-00006.  Impacts were measured on a number of "impact topics," including water quality, air quality, soundscapes, wildlife and wildlife habitat, threatened or endangered species or species of special concern, shoreline vegetation, visitor experiences, visitor conflicts and safety, cultural resources, socioeconomic effects, conflicts with state and local regulations, and management operations.  Id. at 00007-08.  For each topic, NPS described "guiding regulations and policies" before setting forth its methodology for assessing the

---

⁶(...continued)
certain criteria."  68 Fed. Red. 69,360 (Dec. 12, 2003).

alternatives.  Id. at 00006-07.  Then, each alternative was compared to a baseline.[7]  For PIRO, that baseline was represented by Alternative A (i.e. the continuation of PWC use at pre-ban levels); the EA projected impacts under this alternative, and each of the others, over the next ten years.  Id. at 00007.

When the EA was completed, NPS held a public review and comment period.  Based on the comments submitted, NPS issued an errata to the EA, reducing the area that would be open for PWC use under Alternative B.  NPS concluded that Alternative B was the best option for protecting the park's resources and visitors, while still permitting a range of recreational activities.  NPS also declined to prepare a full "environmental impact statement" ("EIS")--as required by NEPA in certain circumstances--and instead issued a FONSI in September 2005, as required by Council of Environmental Quality ("CEQ") regulations.

NPS then began its rulemaking process, publishing a proposed rule in the Federal Register for public comment from November 15, 2004, to January 14, 2005.  In October 2005, NPS issued its Final

_____

[7]      NPS and parties use "baseline," "guideline," and "threshold" almost interchangeably--which is most imprecise and unhelpful.  In the Court's view, this usage is inaccurate.  A "guideline" is an "indication or outline of future policy or conduct (as of a government)."  Webster's Third New International Dictionary 1009 (2d ed. 1981).  A baseline or threshold is a point or level that serves as a basis for comparison or measurement.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 83-84 (D.D.C. 2006).  Given the manner in which NPS and the parties use these terms, the Court must assume they are being used to provide an existing level from which certain impacts are measured.

Rule ("Pictured Rocks Rule"),[8] which re-authorized PWC use, as described in Alternative B; however, the use was restricted to an eight-mile segment of the park's 42-mile shoreline. 70 Fed. Reg. 61,896. The Pictured Rocks Rule also required that PWCs be launched from only one designated site, and prohibited PWC use within 200 feet of the shoreline unless traveling at a slow enough speed so that no wake was created.

## B. Gulf Islands National Seashore

GUIS is located in the northeastern section of the Gulf of Mexico and consists of a 160-mile expanse of barrier islands and waters from the eastern end of Santa Rosa Island in Florida to Cat Island in Mississippi. Within the park are "snowy-white beaches, sparkling blue waters, fertile coastal marshes, and dense maritime forests" as well as "19th century forts . . . shaded picnic areas . . . winding nature trails, and . . . comfortable campgrounds." GUIS-00150. Additionally, visitors can enjoy GUIS' "regionally important ecological sites," the endangered species that are present in several areas, and "[s]everal mostly undisturbed, natural areas in close proximity to major population areas." Id. at 00169.

_____

[8] The FONSIs and final rules at both parks relied on the analysis and conclusions set forth in the EAs. GUIS-00572; 71 Fed. Reg. 26,233-34 (Gulf Islands Rule); PIRO-193; 70 Fed. Reg. 61,895-96 (Pictured Rocks Rule).

GUIS was the most heavily visited seashore in the national park system at the time that the EA was produced in 2004. It was also one of the ten most visited areas in the entire national park system, welcoming an average of 4.9 million people per year. Id. at 00252. According to enabling legislation, NPS must preserve Gulf Islands "for public use and enjoyment [of] certain areas possessing outstanding natural, historic, and recreational values."[9] 16 U.S.C. § 459h(a). Park visitors operate a variety of watercraft, including "ski boats, personal watercraft, runabouts, day cruisers, sailboats, houseboats, canoes, kayaks, and rowboats." Id. at 00306. In addition to the presence of these watercraft, visitors can expect to encounter "military over flights, commercial fishing boats, [and] large ships," because of the military and commercial areas which are nearby. Id.

The park is divided into two management districts, one in Florida and one in Mississippi. In the past, PWC use was allowed in the park, under the same regulations as other motorized watercraft. Most PWC use, however, occurred in Pensacola Bay, in the Florida district, because the waters there were more sheltered and closer to residences with launching facilities than in the Mississippi district.

---

[9] As Intervenors observe, the legislative history of this Act indicates that the area's recreational opportunities were a significant reason for including it in the national park system. See Intervenors' Mot. at 11 (citing S. Rep. No. 91-1514 (1970)).

Under the National Jetski Rule, the GUIS Superintendent initially planned to permit PWC use, regulated through local rules contained in the park's Superintendent's Compendium. The Settlement Agreement, however, required GUIS to issue a special regulation, and to conduct NEPA review, if PWC use was to continue.

In 2001, GUIS management conducted a study of the effects of PWC use within the park. GUIS-00151. The findings of that study were reported in October of 2001 in an Administrative Determination ("2001 Determination") issued by the Gulf Islands Superintendent. The Determination supported a ban on PWC use in the park, id. at 00079, concluding that "PWC use is an inappropriate activity at Gulf Islands National Seashore" Id. The Determination was supported by findings that PWC use negatively impacted the water quality, wildlife, and enjoyment of the park by other visitors at GUIS. Id. at 00073-77.

After the PWC national ban went into effect in April 2002, NPS conducted an EA to further consider the impact of PWCs in the park. In January 2006, the agency issued a FONSI.

The EA considered three alternatives, which were similar to those considered in the Pictured Rocks EA: a no-action alternative which would continue the ban on PWCs and would not require promulgation of any special regulation; Alternative A, which would again allow PWC use in the park at the same level that existed before the national ban; and Alternative B, which would also

reinstate PWC use, but would further limit it through issuance of certain restrictions. GUIS-00151.

NPS then evaluated the impacts of each alternative using a framework nearly identical to the one used in the Pictured Rocks EA.[10] At GUIS, NPS considered the impacts on water quality; human health and airborne pollutants related to PWC use; air quality related values from PWC pollutants; soundscapes; shoreline and submerged aquatic vegetation; wildlife and wildlife habitat; aquatic fauna; threatened, endangered, and any other special status species; visitor use and experience; visitor conflicts and safety; cultural resources; socioeconomic effects; conflicts with state and

---

[10] According to the GUIS EA, NPS used the following process "to determine whether the various PWC management alternatives had the potential to impair park resources and values":

1. The park's authorizing legislation, the <u>1978 General Management Plan</u> (NPS 1978), the <u>Strategic Plan</u> (NPS 1997b), and other relevant background were reviewed with regard to the unit's purpose, significance, resource values, and resource management goals or desired future conditions.

2. PWC management objectives specific to resource protection goals at the park were identified.

3. Thresholds were established for each resource of concern to determine the context, intensity and duration of impacts, as defined above.

4. An analysis was conducted to determine if the magnitude of impact reached the level of "impairment," as defined by NPS <u>Management Policies 2001</u> (NPS 2000d).

GUIS-00266-67.

local ordinances and policies; and impact on park operations from increased enforcement needs.   GUIS-00155.   After completing the EA, NPS again altered course and concluded that PWC use should be permitted in the park, pursuant to the restrictions contained in Alternative B.

This conclusion of the EA restricted PWC use to operating the watercrafts only at speeds that would not create any wake within 300 yards of the shoreline, or within one-half mile of islands with designated wilderness.   PWCs would also be completely prohibited within 200 yards of non-motorized watercraft and people in the water.   The proposed rule was published for public comment from March 17, 2005, to May 16, 2005.   On May 4, 2006, NPS issued a final rule ("Gulf Islands Rule"), once again permitting PWC use in the park, subject to the limits described.   71 Fed. Reg. 26,232.

## II.   STANDARD OF REVIEW

"The arbitrary and capricious standard [of the APA] is a narrow standard of review."   <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971). It is well established in our Circuit that "[t]his court's review is . . . highly deferential" and "we are 'not to substitute [our] judgment for that of the agency' but must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" <u>Bloch v. Powell</u>, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (citations and internal quotation marks omitted);

see also <u>United States v. Paddack</u>, 825 F.2d 504, 514 (D.C. Cir. 1987). However, this deferential standard cannot be used to shield the agency's decision from undergoing a "thorough, probing, in-depth review" by the Court. <u>Midtec Paper Corp. v. United States</u>, 857 F.2d 1487, 1499 (D.C. Cir. 1988) (internal citations and quotations omitted). District courts must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." <u>Mainella</u>, 459 F. Supp. 2d at 90 (quoting <u>Occidental Eng'g Co. v. INS</u>, 753 F.2d 766, 769-70 (9th Cir. 1985)).

An agency satisfies these standards if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action," Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983), and if there is "a rational connection between the facts found and the choice made." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 88 (1983).

Summary judgment will be granted when there is no genuine issue as to any material fact. <u>See</u> Fed. R. Civ. P. 56(c). Because this case involves a challenge to a final administrative decision, the Court's review on summary judgment is limited to the administrative record. <u>Holy Land Found. for Relief and Dev. v. Ashcroft</u>, 333 F.3d 156 (D.C. Cir. 2003) (citing <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973)); <u>Richards v. Immigration & Naturalization Serv.</u>, 554 F.2d 1173, 1177 (D.C. Cir. 1977) ("Summary judgment is

an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record.").

## III. **ANALYSIS**

The dispute in this case involves two distinct legal issues. First, Intervenors advance the threshold argument that Plaintiffs have no standing to challenge the Pictured Rocks Rule permitting jetskis to be re-introduced to that park. Second, Plaintiffs challenge the agency's decisions to pass regulations allowing limited jetski use in these two parks. In their three-count Complaint, Plaintiffs allege that those decisions violated the NPS Organic Act, NEPA, and the Settlement Agreement.

### A. **Standing**

Plaintiffs "[invoke] federal jurisdiction" in this case, and therefore bear the burden of establishing standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Because standing is "not [a] mere pleading requirement[] but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." Id. At the summary judgment stage, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' . . . 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." Id. (quoting Fed. R. Civ. P. 56(e)).

Plaintiffs claim standing to challenge the Pictured Rocks Rule based on the visit of Plaintiff Robert Goodman to the park before issuance of the Rule re-authorizing PWC use at Pictured Rocks. Compl. ¶¶ 6-7. In his declaration, Goodman identifies himself as a Michigan resident, living near Detroit, about 400 miles from Pictured Rocks. Goodman Decl. at ¶¶ 1, 5 (Ex. 2 to Pls.' Opp'n to Standing Mot. ("Pls.' Standing Opp'n")) [Dkt. No. 19-3]. He is an avid kayaker, who takes frequent kayaking trips. Id. at ¶¶ 2-4. He has visited Pictured Rocks only once, in the mid-1990s. Id. at ¶ 5. While there, his enjoyment of the area was diminished by the noise and wake created by PWC use. Id. at ¶ 6. He "decided that [he] would not return to be faced with more Jetskis there." Id. If they are banned, however, he indicates he will be more likely to return to Pictured Rocks, possibly during a sea kayaking symposium at a site "immediately adjacent to Pictured Rocks," or on his own, but not for another two summer seasons because of plans he has already made. Id. at ¶ 8.

Intervenors argue that Plaintiffs lack standing to challenge PWC use at Pictured Rocks, based on Goodman's single trip to the park, before existence of the current Rule, with no concrete plans to return. Standing Mot. at ¶¶ 5-10.[11] They also dispute

---

[11] Defendants take no position on Intervenors' Standing Motion. See Def.'s Mot. at 17 n.4.

Plaintiffs' argument that Goodman has standing in this suit to enforce the Bluewater I Settlement Agreement to which he is a party.  Intervenors' Reply at 24.

It is well established that standing consists of three elements: (1) "injury in fact," or "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent;" (2) "a causal connection," showing that the injury is "fairly traceable to the challenged action of the defendant;" and (3) "that it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision."  Lujan, 504 U.S. at 560-61 (internal citations and quotations omitted); see also Newdow v. Roberts, 603 F.3d 1002, 1009-10 (D.C. Cir. 2010).

Bluewater brings suit on behalf of its members.  Compl. ¶ 4. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).  Additionally, injury to aesthetic and recreational enjoyment is "a cognizable interest for purposes of standing."  Lujan, 504 U.S. at 562-63.  "Only one [Plaintiff] needs to have standing to permit" the Court to resolve

Plaintiffs' claims.  Massachusetts v. EPA, 549 U.S. 497, 518 (2007).  In this case, the one Plaintiff offered is Robert Goodman.

### 1. Plaintiffs Cannot Establish "Injury in Fact" Under their Statutory Claims.

Intervenors dispute only the "injury in fact" element of the standing test.  Standing Mot. at ¶ 5.  As already noted, that injury must be concrete and particularized, and actual or imminent. Goodman's sole visit to the park in the mid-1990s provides the basis for Plaintiffs' assertion of standing.  The Supreme Court has found that, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974).  The Court applied this principle in Lujan, and concluded that plaintiffs could not establish that a change in an agency's interpretation of the Endangered Species Act would produce "imminent" injury because even though the individuals had visited the affected area in the past, they had no firm plans to return.  504 U.S. at 564.

Similarly, in this case, Goodman visited Pictured Rocks in the past, many years before filing the instant suit.  His single visit was allegedly marred by others' PWC use.  In his declaration, he claims that he travels significant distances to kayak, and has done so since the mid-1990s in order to enjoy parks near Pictured Rocks. Goodman Decl. at ¶¶ 3-5.  However, it is of great significance that he has not re-visited PIRO, even though there was a PWC ban in

place for more than three years before 2005.  Id. at ¶ 7.  He states that if the ban were imposed again, he would "return to the Lakeshore within two summer seasons."  Additionally, he has plans to travel to the area as part of a kayaking symposium.  Even if the ban were in effect at that time, he can only say that he would "be more likely" to participate in day trips to kayak at Pictured Rocks.  Id. at ¶ 8.

Goodman's use of the park, and alleged injury, bears a strong resemblance to the injury that the Supreme Court rejected in Lujan. In both instances, a single earlier visit to a region was the source of the injury.  See Lujan, 504 U.S. at 563-64 (describing that two plaintiffs each took single trip).  Further, in each case, those parties failed to return to the region.  One Lujan plaintiff, when asked of plans to return, stated that she planned to return, but did not have any concrete plans to do so.  Id.  Likewise, Goodman states an intention to return, and has claimed that he would do so within two years, but does not indicate any concrete plans.  Goodman Decl. at ¶ 8.  He has had ample opportunity to do so, as he travels in the area to kayak.  Even when a PWC ban was in place for several years, he chose not to visit PIRO.  Such facts indicate that the injury is not, in this case, actual or imminent. Standing does not exist where "'some day' intentions--without any description of concrete plans, or indeed even any specification of

when the some day will be" make up the basis of the "actual or imminent" injury being alleged. Lujan, 504 U.S. at 564.

Plaintiffs argue that Goodman's situation is more analogous to that of the plaintiffs in Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc., 528 U.S. 167 (2000), whose visits to a polluted South Carolina river were found to be sufficient to establish an injury in fact for standing purposes. See id. at 183. That case, however, presented very different facts. There, plaintiffs made frequent visits to the site. They lived near the river, and came into contact with it regularly; as a result, they continuously were exposed to its polluted waters and the spoiled natural environment, thereby establishing an actual injury in fact. Id. at 181-83. In Laidlaw, the challenged illegal activity "directly affected affiants' recreational, aesthetic, and economic interests." Id. at 183-84.

In the instant case, Goodman's one visit to Pictured Rocks is a far cry from the frequent and ongoing contacts found to be sufficient in Laidlaw. Of course, "standing does not depend on the size or quantum of harm to the party." Animal Welfare Inst. v. Comm. for Humane Legislation, Inc., 561 F.2d 1002, 1008 (D.C. Cir. 1977). Nevertheless, where, as here, an individual has made only one visit, has no firms plans to return, has no ongoing connection with the park, and has bypassed opportunities to visit when he was

in the area, the claim of an "actual and imminent" injury must be rejected.[12]

### 2. Plaintiffs Have Standing to Enforce the Terms of the Settlement Agreement Based on Goodman's Status as a Plaintiff in Bluewater I.

Plaintiffs also argue that because Goodman was a plaintiff in Bluewater I, and because he is a party to the Settlement Agreement reached in that case, he has standing to enforce its provisions in this case. Pls.' Standing Opp'n at 14 n.6; Pls.' Reply at 23; see also Berger v. Heckler, 771 F.2d 1556, 1564 (2d Cir. 1985) (permitting a plaintiff to sue to enforce a consent decree under "basic contract principles"); City of New York v. Dep't of Commerce, 739 F. Supp. 761, 766 (E.D.N.Y. 1990).

---

[12] A decision from the Ninth Circuit, invoked by both parties to support their arguments, does not alter the outcome in this case. In Ecological Rights Foundation v. Pacific Lumber Company, 230 F.3d 1141 (9th Cir. 2000), the Ninth Circuit held that members of an environmental organization had standing to challenge a lumber company's conduct under the Clean Water Act. Pacific Lumber, 230 F.3d at 1151. Plaintiffs in that case had visited the site--a creek in California--with some regularity. One plaintiff, Christopher Hinderyckx, "continued to drive to [the area] often, sometimes stopping along the creek." Id. at 1144. Hinderyckx said that he was less likely to swim and fish in the creek because of pollution, and maintained that "he aesthetically enjoy[ed] his recreational activities there less than he otherwise would." Id. at 1144-45.

The Ninth Circuit's analysis depends on facts that differ from the facts in this case. Goodman did not visit Pictured Rocks with any regularity. He did not return, even when PWC use was banned. He has no regular contact with the park. Based on these distinctions, the holding in Pacific Lumber does not dictate a different outcome in this case.

Paragraph 9 of the Settlement Agreement requires all suits challenging final rules promulgated under ¶¶ 1-4 of the Agreement to be filed as new lawsuits. Settlement Agreement at ¶ 9. Paragraphs 1-4 provide that all PWC use is to be banned, after a grace period for certain parks including PIRO and GUIS, unless special, site-specific regulations are promulgated for each park where jetskis are to be allowed. Thus, challenges to the rules permitting PWC use in those parks must be filed as new lawsuits, not as continuations of <u>Bluewater I</u>. Plaintiffs are challenging rules promulgated under ¶¶ 1-4, and so their claims must be considered a new lawsuit.

In light of the terms of the Settlement Agreement, therefore, the appropriate question is whether Goodman's participation in <u>Bluewater I</u> gives him standing to participate in an entirely new suit to enforce settlement of the earlier litigation. Of course, standing must be established in every new case whether it stems from an earlier related case or not. <u>Lujan</u>, 504 U.S. at 560-61; <u>Fla. Audobon Soc'y v. Bentsen</u>, 94 F.3d 658, 663 (D.C. Cir. 1996) ("[A] showing of standing is an essential and unchanging predicate to any exercise of our jurisdiction.") (citation and quotations omitted).

The Settlement Agreement is unquestionably a contract. <u>Makins v. District of Columbia</u>, 277 F.3d 544, 546-47 (D.C. Cir. 2002). Goodman is a party to that contract. Individuals who are parties

to a contract have standing to enforce the terms of that contract in the event that breach is alleged.  See Tenn. Elec. Power Co. V. Tenn. Valley Auth., 306 U.S. 118, 137-38 (1939) (standing exists when "the right invaded is a legal right[]--one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege"); T Street Dev., LLC v. Dereje and Dereje, 586 F.3d 6 (D.C. Cir. 2009).  Therefore, the Court concludes that Goodman has standing in this lawsuit to enforce the terms of the Settlement Agreement in Bluewater I.

The provisions of that Agreement require Defendants to, among other things, base any regulatory changes on "appropriate analysis under [NEPA]."  Settlement Agreement at ¶ 5.  Apart from describing the nature of the dispute in Bluewater I, the Settlement Agreement is completely silent as to any obligations of the Government under the Organic Act.  See id. at ¶ 9 ("Nothing in this agreement may be construed to otherwise limit or modify the discretion accorded to the defendants by the statutes they administer or by general principles of administrative law.").  Because Goodman only has standing to enforce the Settlement Agreement, and because that Agreement does not speak to Defendants' compliance with the Organic Act, he does not have standing to raise challenges under that Act.  Therefore, Plaintiffs may only challenge the PIRO rule under the terms of the Settlement Agreement, for a violation of NEPA.

**B. The Organic Act Governing NPS Actions**

Plaintiffs contend that NPS' decision to re-introduce PWCs was arbitrary and capricious under the APA and the provisions of the Organic Act. First, they argue that NPS failed to account for its "reversal" of policy in re-introducing jetskis to the parks after making specific pronouncements banning them. Pls.' Mot. at 24-32. Second, they maintain that, even assuming there was no policy reversal, "the agency nonetheless failed to meaningfully explain how reauthorizing Jetskis is consistent with the agency's obligations under the Organic Act." Id. at 33.

**1. Legal Analysis**

The Act, passed by Congress in 1916, provides that the NPS must:

> promote and regulate the use of the . . . national parks, monuments, and reservations hereinafter specified . . . by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

In 1978, Congress passed the 1978 Redwood Act, 16 U.S.C. § 1a-1, which supplements the Organic Act and reaffirms its original mandates that, "[t]he authorization of activities shall be construed and the protection, management, and administration of

-26-

these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress." Id.

NPS' Management Policies, most recently updated in 2006, interpret the provisions of these two key statutes. See NPS Management Policies 2006, at 1.4.1, available at www.nps.gov/policy/mp2006.pdf ("2006 NPS Policies").[13] According to those Policies, "[t]he fundamental purpose of the national park system . . . begins with a mandate to conserve park resources and values." Id. at 1.4.2. They continue by stating, "[t]he fundamental purpose of all parks also includes providing for the enjoyment of park resources and values by the people of the United States"--this Policy applies to visitors who actually travel to the

---

[13]    While these Policies are not judicially enforceable, Wilderness Soc'y v. Norton, 434 F.3d 584, 596-97 (D.C. Cir. 2006), they are "relevant insofar as NPS puts forth the Policies as justification for the decision under review," Greater Yellowstone Coalition v. Kempthorne, 577 F. Supp. 2d 183, 206 (D.D.C. 2008); see also Mainella, 459 F. Supp. 2d at 79 n.1. NPS cites in its EAs the 2001 version of the Policies. In terms of provisions discussed in this Opinion, the 2001 and 2006 NPS Policies contain virtually identical language. Compare 2006 NPS Policies with 2001 NPS Management Policies, available at http://www.nps.gov/refdesk/mp/index.html ("2001 NPS Policies"). Further, Defendants in their Motion for Summary Judgment refer to the most recent version of these Policies (2006), and agree that this "Service-wide policy document . . . informs and directs management of park resources under the Organic Act." Defs.' Mot. at 14. Because parties refer to the 2001 NPS Policies, the Court will use that version.

parks, and to those who appreciate them from afar.  Id. at 1.4.3.
While the agency recognizes that managers may in their discretion
allow impacts that do not represent an impairment, "NPS managers
must always seek ways to avoid, or to minimize to the greatest
degree practicable, adverse impacts on park resources and values."
Id.

To reconcile values that may at times be in tension with one
another--conservation and recreation--NPS itself has consistently
interpreted the Organic Act to prioritize conservation, see PIRO-
00022; GUIS-00169, and recognized that the courts as well "have
consistently interpreted the Organic Act and its amendments to
elevate resource conservation above visitor recreation."  Id.
(citing cases); see also 2006 NPS Policies at 1.4.3 ("Congress,
recognizing that the enjoyment by future generations of the
national parks can be ensured only if the superb quality of park
resources and values is left unimpaired, has provided that when
there is a conflict between conserving resources and values and
providing for enjoyment of them, conservation is to be predominant.
This is how courts have consistently interpreted the Organic Act.")
(emphasis added).

There can be no doubt, as NPS and the courts have concluded,
that the overriding aim of the Organic Act, as well as the purpose
of NPS' oversight and management of the park system, is to conserve
the natural wonders of our nation's parks for future generations.

See <u>Greater Yellowstone Coalition</u>, 577 F. Supp. 2d at 191-93; <u>Nat'l Rifle Ass'n of Am. v. Potter</u>, 628 F. Supp. 903, 909 (D.D.C. 1986) ("In the Organic Act, Congress speaks but of a single purpose, namely, conservation.").

As Defendants have observed, NPS is granted broad discretion to implement its mandate "to conserve the scenery and the natural and historic objects and the wild life." 16 U.S.C. § 1. In doing so, it must strike the appropriate balance between prioritizing conservation and providing for use and recreation by the public. <u>See</u> Defs.' Mot. at 14; <u>Daingerfield Island Protective Soc. v. Babbitt</u>, 40 F.3d 442, 446 (D.C. Cir. 1994) (adopting District Court reasoning that terms of Organic Act endow NPS with "broad, but not unlimited discretion in determining what actions are best calculated to protect Park resources."). Nevertheless, that discretion is "bounded by the terms of the Organic Act itself." <u>Greater Yellowstone Coalition</u>, 577 F. Supp. 2d at 193. Those terms require that NPS' stewardship of the parks leave them "unimpaired for the enjoyment of future generations." 16 U.S.C. § 1; <u>see also</u> GUIS-00266 (stating in EA that NPS recognizes statutory limit to discretion).

The NPS Policies guide the agency in determining what constitutes an impairment. According to those Policies, an action rises to the level of an impairment when the impacts of that action "harm the integrity of park resources or values, including the

opportunities that otherwise would be present for the enjoyment of those resources or values." 2001 NPS Policies at 1.4.5; PIRO-00022; GUIS-00170. As NPS indicates in its EAs, the agency determines if an impairment would occur by evaluating "particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." Id.

## 2. Re-introduction of PWCs to Gulf Islands[14]

Plaintiffs maintain that NPS failed to explain what they characterize as a reversal of policy from the agency's earlier decision to permit the National Jetski Rule banning PWC use in each park to take effect in 2002. The EA and FONSI led to a re-introduction of PWC use at Gulf Islands in 2006, 36 C.F.R. § 7.12. By issuing the Gulf Islands Rule, NPS, according to Plaintiffs, "reversed course" from earlier PWC policies; in doing so, it failed to provide a "reasoned analysis" for the reversal, and thus engaged in arbitrary and capricious conduct under both the Organic Act and the APA. Pls.' Mot. at 24-26; see State Farm, 463 U.S. at 42, 57. Plaintiffs suggest that such a reversal is subject to a heightened standard of review. Pls.' Mot. at 25.

_____

[14] As noted earlier, there can be no ruling on Plaintiffs' challenge to the Pictured Rocks Rule under the Organic Act because of lack of standing.

Intervenors and Defendants dispute Plaintiffs' interpretation of the facts. They insist that the 2006 Rule allowing PWC use is not a reversal of long-standing NPS policy, but rather continuation of a long-standing policy to allow PWC use, subject to various state and local restrictions. Defs.' Mot. at 35-38; Intervenors' Mot. at 22-25. Further, they argue that regardless of whether or not the Rule represented a change of course, NPS was permitted under NEPA and the Settlement Agreement to re-visit the PWC ban and issue a new rule based on updated information. Defs.' Mot. at 37-38.

Recent Supreme Court and Court of Appeals decisions bear directly on this issue. In FCC v. Fox Television Stations, Inc., 129 S. Ct. 1800 (2009), the Supreme Court decided that after a change of policy, "the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." Id. at 1811. Adopting the reasoning in Fox, our Court of Appeals has stated that, "[e]xplanation of a change in policy is not subject to a heightened standard of review." Anna Jacques Hosp. v. Sebelius, 583 F.3d 1, 6 (D.C. Cir. 2009).

At oral argument, Plaintiffs' counsel argued that Fox need not be read to reject a heightened standard of review for policy reversals, but failed to put forward convincing reasons to support that interpretation. Tr. at 18-20 (May 17, 2010). In actuality,

the meaning of Fox and Anna Jacques is quite clear: it is not relevant under State Farm whether an agency is reversing existing policy or simply creating a new one; instead, what is relevant is whether the agency supplied a "rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

In sum, Fox and Anna Jacques make it clear that even though there is no heightened standard of review when examining an agency's change of course, State Farm still guides the inquiry as to whether the agency's actions are arbitrary and capricious. In this case, the earlier national rulemaking and administrative determination banning PWCs at GUIS are relevant, because the Court must compare those former decisions to the latter Gulf Islands Rule in deciding whether the agency has adequately explained its change in policy. See Nat'l Cable & Telecomm. Ass'n v. FCC, 567 F.3d 659, 667 (D.C. Cir. 2009) ("Of course, 'it is axiomatic that agency action must either be consistent with prior action or offer a reasoned basis for its departure from precedent.' . . . Yet it is equally axiomatic that an agency is free to change its mind so long as it supplies 'a reasoned analysis. . . .'") (citations and quotations omitted).

In Plaintiffs' view, the 2001 Determination represents a "specific determination[]" to ban jetskis at Gulf Islands. Pls.'

Mot. at 26. They argue that the new Rule re-introducing PWCs in 2006 lacked "specific new data and information that had been collected and analyzed since the earlier decisions had been made." Id. Plaintiffs complain that the new Rule overturned the earlier bans and impermissibly relied on "assumptions and extrapolations from scientific literature," data from other parks, and personal observations from park staff, rather than collecting data and making site-specific findings of impacts at the park. Id. (quoting GUIS Final Rule, 71 Fed. Reg. 26,234). They also insist that issuance of the Gulf Islands Rule, overturning the National Jetski Rule, ignored the detailed findings about the general harms that result from PWC use anywhere in the park system, which the National Rule described. Id. at 25. Under State Farm, Plaintiffs argue, this change in position was arbitrary and capricious.

The National Jetski Rule, which eventually went into effect at both parks in 2002 after being adopted in 2000, "prohibits PWC use in areas of the National Park System unless [NPS] determines that PWC use is appropriate for a specific area based on that area's enabling legislation, resources, values, other visitor uses, and overall management objectives." 65 Fed. Reg. 15,078. Certain parks, including PIRO and GUIS, were permitted to re-introduce jetskis after undertaking a Special Regulation rulemaking, which required a nationwide notice-and-comment period. Id. at 15,079.

The 2001 Determination, concluding that PWC use would be "an inappropriate activity at Gulf Islands," found that "PWC use poses considerable threats to estuarine flora and fauna, pollutes waters essential to estuarine and marine health, poses unacceptable risk of injury to operators and bystanders, and conflicts with the majority of other longstanding uses of the Seashore." GUIS-00079. These findings were supported by a relatively brief analysis of PWC impacts on noise, water quality, wildlife, and safety and visitor use. Id. at 00072-77. While the analyses often invoked studies undertaken at other parks, they also included data drawn from direct observations of GUIS staff. See, e.g., id. at 00074 (citing 1995 study of noise impacts on colonially nesting birds, and citing observations of GUIS park staff).

At the time of the 2001 Determination, PWC use was allowed along much of the shoreline at Gulf Islands, an area that suffered significant impacts according to NPS analysis in the 2001 Determination. See id. at 00075 (noting "significant threat" posed to sea turtles that nest in shallow waters, and disturbance to nesting bald eagles and osprey by human intrusion "along the shoreline"); id. at 00075-76 (noting damage to "shallow grassbeds"); id. at 00077 (concluding that PWC range and the "standard procedure of operating close to the shoreline can easily and quickly shatter [visitor] experience in even the most remote sections of the park"). However, certain state regulations on PWC

use did exist, restricting the time, manner, and location of PWC use. See GUIS-00191-192. These regulations were incorporated into Alternative B's restrictions on PWC use. See id. at 00190-193.

Two significant restrictions were added to Alternative B, the NPS' preferred alternative, before it was adopted by the agency: (1) "[a] flat-wake zone would be established 300 yards from all park shorelines at the low-water mark," with certain exceptions; (2) "[n]o PWC operation would be permitted within 200 feet of non-motorized watercraft and people in the water." GUIS-00193.

In its Gulf Islands EA, NPS relied heavily on these new restrictions of PWC operation to justify its decision to again allow their use. GUIS-00195 ("Alternative B would have limited impacts on the national seashore's natural resources through protection of shoreline areas with flat-wake zoning prescriptions."); see also id. at 00314-15 (discussing reduced noise impact to visitors due to flat-wake zone); id. at 00321 ("[H]owever, since alternative B includes increased mitigation such as additional flat-wake zones, impacts would be fewer than alternative A."); id. at 00349 (finding that flat-wake zone would minimize impacts of PWC use to threatened and endangered species).

Plaintiffs contend that such reliance on the mitigating effects of the flat-wake zone is misplaced, as the restriction is unenforceable as a practical matter. Pls.' Mot. at 29-30. There is evidence in the record that the 300-yard line is difficult for

PWC users to identify, GUIS-05849, and that GUIS does not plan to demarcate the line with buoys or other indicators, 71 Fed. Reg. 26,235.

However, there is a presumption that NPS will enforce its own rules and policies. See Intervenors' Mot. at 30 (collecting cases). Further, NPS did announce its plan for enforcing the restrictions contained in the preferred alternative, including increased patrolling, training of officers, and an education campaign, as well as a before-and-after photography study to determine if additional areas should be closed to PWC use. 71 Fed. Reg. 26,242; GUIS-00580 (describing plan in FONSI). Given the presumption that NPS will enforce its rules, and the measures undertaken to effectuate that enforcement, the Court will accept NPS' assurances in this case.

The flat-wake zone and other updated restrictions that make up Alternative B distinguish the enforcement environment under the EA from that in place when the 2001 Determination was issued. NPS relied on these restrictions in conducting its extensive study of jetski impacts at Gulf Islands. Additionally, it discussed a greater number of impact topics in the EA, used more recent studies, see, e.g., GUIS-00308, and a more clearly articulated methodology to analyze impacts and impairments, see infra at III.B.3.a.

Initiating the EA process and re-visiting the ban on jetskis was, of course, well within the authority granted to Gulf Islands by the National Jetski Rule and the Settlement Agreement. 65 Fed. Reg. 15,079; Settlement Agreement at ¶ 4. NPS based its decision to depart from the conclusions of the National Rule and the 2001 Determination, to a substantial extent, on updated facts and enhanced restrictions on PWC use. For these reasons, it is clear that NPS had a reasonable basis for reconsidering the validity of its 2001 Determination.

This finding does not mean that the agency provided a clear, reasoned, and adequately justified analysis in arriving at its final decision to re-introduce jetskis to Gulf Islands. That issue will now be directly addressed, <u>infra</u>, in examining Plaintiffs' second argument under the Organic Act that the Defendants "failed to meaningfully explain" how re-introducing PWCs is consistent with NPS' obligations under the Organic Act. Pls.' Mot. at 33. Plaintiffs contend that even if the EA and FONSI were issued without the backdrop of earlier national rules or park-specific administrative determinations, the analysis conducted by NPS failed to explain how the facts found led to the conclusion that each impact was not an "impairment" under the Organic Act in violation of <u>State Farm</u>'s insistence that the agency provide a "rational connection between the facts and the choice made." <u>State Farm</u>, 463 U.S. at 43.

## C. NPS' Gulf Islands Rule

On April 20, 2000, the National Jetski Rule went into effect, banning jetskis in all but 21 of the National Parks. As one of the 21 parks excepted from the Rule for two years, Gulf Islands could continue to allow jetski use. If, after that two-year grace period the park took no action, PWCs would be banned. If the park chose to permit PWC use after the grace period, it had to undertake Special Regulation rulemaking, which would include a notice and comment period.[15] 65 Fed. Reg. 15,079-80. In October of 2001, Gulf Islands' Superintendent, Jerry A. Eubanks, issued the 2001 Determination, which concluded that PWC use "is an inappropriate activity" at the park. GUIS-00079. In 2002, Gulf Islands then allowed the grace period to expire, and the PWC ban went into effect. PWCs were then re-introduced to the park in May of 2006, after the passage of a park-specific Rule permitting restricted use of the machines.

### 1. NPS' Methodology[16]

The Gulf Islands EA, which embodies the agency's methodology, analysis, and conclusions, begins with a description of PWC use and

---

[15]    The Settlement Agreement further stipulated that "any Special Regulation . . . addressing the continued use of PWCs will be based on appropriate environmental analysis under [NEPA], which analysis will, _inter alia_, consider the impacts of PWC use in the particular unit." Settlement Agreement at ¶ 5.

[16]    The methodology used at GUIS is virtually identical to that adopted at PIRO.

NPS' obligations under various statutes and internal directives. GUIS-00164-177. It continues by describing several impact topics, or subject matter, such as water quality, soundscapes, etc., that may be affected by re-introducing PWCs into the park. Id. at 00178-190. In the "Alternatives" section, NPS identifies three different approaches to PWC use in Gulf Islands, one of which will be adopted by the EA. Id. at 00190-222. The EA then discusses the environment at GUIS, providing detailed data and descriptions that pertain to a range of natural and recreational activities within Gulf Islands. Id. at 00223-263.

In the "Environmental Consequences" section of the EA NPS analyzes what potential impacts can flow from the three alternatives examined, and reports its conclusions. Before describing the impact that PWC use would have on each item, NPS sets forth the "guiding regulations and policies" that apply to that item. Often, these regulations and policies contain objective standards mandated by state or federal statutes or regulations, see, e.g., id. at 00270; 00290; 00305. At times, the "guiding regulations and policies" state how NPS' internal policies govern its approach to managing a certain subject matter, see, e.g., id. at 00315; 00353. For example, in stating its approach to "visitor use and experience," the agency summarizes relevant provisions of the 2001 NPS Policies related to ensuring visitor enjoyment and guarding against impairments, and also discusses certain visitor

satisfaction and safety goals contained in its <u>Strategic Plan</u>. <u>Id.</u>
at 00353.

After setting forth these governing standards, NPS articulates
the "methodology and assumptions" it will apply in assessing the
impacts on each topic. It describes the potential impacts
according to their type, context, duration, and intensity. The
type of impact can be adverse or beneficial. The context of an
impact can be site-specific, local, or regional. The impact's
duration can be short-term or long-term. The intensity can be
negligible, minor, moderate, or major. For each impact topic
except for visitor use and experience, NPS also defines when PWC
use would rise to the level of an impairment. Because intensity
definitions vary according to impact topic, NPS sets forth a
separate intensity definition for each impact topic; these
definitions are referred to as impact thresholds. <u>Id.</u> at 00265.

In the analysis section of the EA, each alternative--no-action
(continued ban on PWCs), Alternative A (reinstate jetskis as
previously managed), and Alternative B (reinstate jetskis with
additional limitations on their use)--is compared to a baseline.
At GUIS, the baseline is the continuation of the ban under the no-
action alternative. NPS determines impacts for each by comparing
the expected effects of each alternative to thresholds established
by scientific literature, federal and state standards, experts, and
other agencies, and NPS resource management objectives. <u>Id.</u> At

-40-

the conclusion of each analysis section, NPS reports its findings as to the impacts expected under each alternative, as well as the expected cumulative impacts that can result from PWC use and other motorized watercraft use.

## 2. NPS' Conclusions

After conducting an analysis using this methodology, NPS concluded, for _every_ impact topic, that Alternative B, which permits jetski use with additional restrictions, is the preferred alternative at GUIS. GUIS-00195. According to NPS, PWC use under Alternative B's limits would not result in any impairments to park resources. GUIS-00153-155 (Table A, summarizing conclusions). Specifically, NPS concluded that Alternative B would generate only a "negligible adverse" impact on water quality, _id._ at 00287; a "negligible adverse" to "minor adverse" impact on air quality, _id._ at 00297-98, 00303; a "negligible to minor adverse" impact on soundscapes, _id._ at 00315; "negligible adverse" impacts on vegetation, _id._ at 00321; "negligible" and "minor to moderate impacts" on wildlife, _id._ at 00329, 00334; and, in terms of visitor experience and safety, a beneficial impact on PWC users and a variety of adverse impacts on non-PWC users, _id._ at 00363, 00371.

Significantly, NPS based its analysis on the assumption that PWC users would be operating the older, noisier, and more polluting two-stroke machines. 71 Fed. Reg. 26,236-37; GUIS-00171; 00313. It acknowledged that this approach was more "conservative" than

attempting to factor in the expected transition to cleaner and quieter four-stroke or direct-injection two-stroke engines. 71 Fed. Reg. 26,236-37.

However, NPS did not consistently rely on this conservative assumption. For example, at times it would claim that certain impacts would be minimized in the future due to the eventual transition to machines with improved engines. See, e.g., GUIS-00287 ("[I]mpacts from PWC use are expected to remain negligible due to reduced emission rates of newer technology engines."); 00381 (describing likely reduction in pollutants "in the long term," because of "required improvements in engine emission technology"). NPS fails to explain its seemingly inconsistent commitment to the conservative approach of using older two-stroke engines for measuring certain impacts, but relying on the transition to more environmentally friendly four-stroke engines for measuring other impacts.

Additionally, as Plaintiffs note, there is no certainty that the superior four-stroke PWCs will, in fact, displace the two-stroke machines by 2012, as NPS assumed.[17] Intervenors argue that the conversion is proceeding apace, as the industry has been driven to produce cleaner machines by more strict environmental regulations on PWC pollutants. Intervenors' Reply at 5-7.

_____

[17] NPS "expects that by 2012, most boat owners will already be in compliance with the 2006 EPA Marine Engine Standards." GUIS-00170.

However, as the Gulf Islands EA reports, the EPA "assumes that the existing two-stroke engine models would not be completely replaced by newer PWC technology until 2050"--38 years later than NPS considered in its analysis for its assessments.  GUIS-00170.  Significantly, neither park adopts the safest and most conservative approach of all--an outright ban on two-stroke engines from the waters of both.[18]

Plaintiffs' main argument under the Organic Act is that, for each topic, NPS failed to provide a reasoned analysis for its conclusions, and instead relied on conclusory language that did little more than recite its compliance with duties imposed by that Act.  Pls.' Mot. at 33-36.  Therefore, the Court will now turn to examine each impact topic in turn,[19] in order to determine whether in fact NPS did "examine the relevant data and articulate a

----

[18]   As Plaintiffs observe, the record casts at least some doubt on the beneficial effects of conversion to newer engines.  Pls.' Mot. at 31 n.14.  For instance, according to a study cited in the Gulf Islands Rule, newer engines produce increased NOx emissions, 71 Fed. Reg. 26,237; additionally, direct-injection two-stroke machines may result in elevated PAH levels.  GUIS-00171-172.  Further casting doubt on the anticipated beneficial effects of conversion, is NPS' acknowledgment in its 2001 GUIS Determination that "aftermarket modifications" to PWCs are common.  In other words, operators modify their jetskis to "increase horsepower and thrust."  Thus, the effect may be to undo manufacturers' efforts to reduce noise levels.  Id. at 00073.

[19]   Water quality, air quality, soundscapes, vegetation, wildlife, and visitor experience will be discussed.   It is not necessary to examine the other impact topics assessed in the GUIS EA: "cultural resources," "socioeconomic effects," and "national seashore management and operations."

satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" State Farm, 463 U.S. at 43 (citation omitted); see Mainella, 459 F. Supp. 2d at 100.

Two recent decisions have adopted this approach. In Sierra Club v. Mainella, the court held that NPS "failed adequately to explain its conclusion that impacts from nearby surface drilling activities would not result in an impairment of park resources and values." 459 F. Supp. 2d at 103. In that case, the NPS described the various impacts that directional drilling would have at Big Thicket National Preserve by assigning modifiers to the degree of disruption that the drilling would create. For instance, the intensity of the particular impact--i.e., impact on soundscapes or air quality--could be described as "negligible, minor, moderate, or major;" the area affected was either "localized" or "widespread;" and the duration of the impact was "short-term" or "long-term." Id. at 84. In its EAs and FONSIs, NPS found that drilling would not impair park resources.

In Mainella, NPS failed to supply a reasoned analysis that linked its findings for the degree of adverse impacts to the ultimate decision that no impairment would result from such impacts. The agency invoked only "conclusory" labels to describe impacts, thereby depriving the court of any "basis to determine first, whether NPS reasonably concluded that the impact is [of a

-44-

certain intensity], and second, whether NPS reasonably concluded that a [a certain intensity] impact should not, under the relevant circumstances, be considered an impairment." Id. at 101.

Similarly, in Greater Yellowstone Coalition, challenging the use of snowmobiles in three national parks, the court held that NPS' impairment determinations were arbitrary and capricious because they failed to explain why certain impacts did not rise to the level of an impairment. 577 F. Supp. 2d at 201-202 ("Like the Court in Mainella, this Court is equally perplexed as to why any impact characterized as 'major and adverse' does not constitute an unacceptable impact, let alone impairment. This is a distinction NPS again fails to explain.").

### 3.  Water Quality

In assessing impacts to water quality, NPS began by announcing in its EA which regulations and policies would guide its analysis. The agency noted that the Environmental Protection Agency ("EPA") has developed recommended ambient water quality criteria for a range of pollutants. GUIS-00270. The EPA standards set forth the minimum volumes of water that would be needed to dilute each expected pollutant emitted by PWCs to produce safe levels for human health.

However, EPA did not issue "water quality criteria for the protection of aquatic life for the PWC-related contaminants." Id. at 00271. According to its Management Policies, NPS works to

"obtain the highest possible standards available under the Clean Water Act for the protection of park waters," and to comport with all applicable federal, state, and local laws and regulations. Id. Because neither GUIS nor EPA possess "quantifiable water quality data" on the effects of PWC emissions, NPS used "water quality standards," because of the absence of park-specific data. Id. Moreover, it is never made entirely clear where these "standards" were derived from.[20] These standards take into account uses of the water, and set minimum criteria to protect those uses and prevent degradation of water quality. Id. According to the EA, NPS regulations require that "PWC use could not be authorized to the degree that it would lower" the standards announced in the regulations or affect the use of the water as "fishable/swimmable." Id. at 00271-72 (referring to 40 C.F.R. § 131.12(a)(2)).

NPS explained how site-specific data was calculated. After considering the extent of PWC use at Gulf Islands (i.e. number of jetskis and hours of operation) and applying ecotoxicological human health benchmarks announced in EPA guidelines, NPS calculated the minimum amount of water needed to dilute each pollutant to meet those EPA benchmark levels. Id. at 00274. The agency then

---

[20] NPS states that the "antidegradation policy" found in 40 C.F.R. § 131.12(a)(2) "is only one portion of a water quality standard." GUIS-00271. In the "methodology and assumptions" section of its analysis, NPS describes this regulation in some more detail. It then notes that "state water quality standards" and "various literature sources" were examined and provided benchmarks. Id. at 00272.

explained that it would categorize the impacts that resulted by using modifiers "negligible," "minor," "moderate," "major," and "impairment." <u>See</u> <u>infra</u> at p. 48 n. 23. For each modifier, NPS described the expected corresponding impacts. For instance, a "minor" impact "would be detectable but would be well below water quality standards or criteria and within historical or desired water quality conditions." <u>Id.</u> at 00277.

For each of the three alternatives under consideration--no-action (continued ban on PWCs), Alternative A (reinstate jetskis as previously managed), and Alternative B (reinstate jetskis with certain limitations on their use)--the agency analyzed the amount of jetski use, and assessed the impacts quantitatively before applying one of the impact modifiers.[21] Tables 33 and 34 of the EA report the findings for Alternative B. For each pollutant, the threshold volume needed to dilute the pollutant to benchmark levels is well below the volume of water available in each area of the park. In short, according to NPS calculations, there is more than enough water to reduce the polluting impact of jetski emissions to acceptable levels.

---

[21]    For example, NPS calculated the threshold volume of water to dilute the pollutant benzo(a)pyrene to benchmark levels to be 730 acre-feet of water in a certain area of the park in 2002 under Alternative A. GUIS-00282 (Table 31). It presented tables of data that listed thresholds for each pollutant in several areas of the park for the years 2002 and 2012.

The preferred alternative, Alternative B, resulted in water quality impacts that were "negligible adverse for all pollutants in all areas of the national seashore in 2002." Id. at 00287. NPS reported that it expected this impact to remain the same in 2012 even as PWC use increased, because of "reduced emission rates of newer technology engines." Id. NPS also looked at cumulative impacts to water based on PWC and non-PWC motorized watercraft. Although PWCs represented a small fraction of the motorized watercraft operated at Gulf Islands,[22] they contributed approximately 30% of total emissions from all motorized watercraft in 2002. That number was expected to rise to 50% in 2012. Id. at 00288. Despite an increase of more than 66% in expected emissions from PWCs, NPS still concluded that no impairment would result, without any explanation of how this result could logically follow.

According to Defendants and Intervenors, this analysis satisfies NPS' obligations under the Organic Act, and must be upheld as reasonable under the APA's arbitrary and capricious standard. Plaintiffs argue that it fails because NPS did no more than identify the impact, label it (in this case, "negligible"), and conclude there was no impairment. As in Mainella, they argue,

---

[22]    "According to park staff, personal watercraft comprise approximately 4% of recreational boating vessels in the Mississippi District of the park.  In the Florida District, it is estimated that personal watercraft comprise 0.5% of recreational boating in that district."  GUIS-00267.  Obviously, PWCs produce a greatly disproportionate percentage of the total emissions from all motorized watercraft.

the agency totally failed to explain <u>why</u> the announced impact did not amount to an impairment.  Pls.' Opp'n at 13-14.

The connection between the quantitative data, impact labels, and ultimate conclusion of non-impairment is hard to fathom. First, NPS explains that for three of the modifiers (negligible, minor, and moderate), the impact of PWC use would be <u>below</u> water quality standards.  The only differences amongst the three are whether the impacts are "detectable," the degree to which they are below water quality standards (e.g. "below" or "well below"), and whether emissions would approach "historical or desired water quality conditions."[23]  GUIS-00277.

_____

[23]    These three impact thresholds are described as follows:

Negligible: Impacts are chemical, physical, or biological effects that would not be detectable, would be well below water quality standards or criteria, and could be within historical or desired water quality conditions.

Minor: Impacts (chemical, physical, or biological effects) would be detectable but would be well below water quality standards or criteria and within historical or desired water quality conditions.

Moderate: Impacts (chemical, physical, or biological effects) would be detectable but would be at or below water quality standards or criteria; however, historical baseline or desired water quality conditions would be altered on a short-term basis.

GUIS-00277.

It is difficult to discern any meaningful or objective difference between these three modifiers. Each pollutant was measured, and therefore each one must be, at the very least, "detectable." That fact can hardly be used to distinguish between a minor and a moderate impact. See GUIS-00276 (Tables 26 and 27) (reporting amount of emissions "loaded" into water for each pollutant). Furthermore, any of the three modifiers can conceivably be applied to impacts where the water quality is below the national standards. See GUIS-00277. Finally, those "historical or desired water quality conditions" mentioned in these impact thresholds are not defined, nor is it explained how or why they differ from EPA water quality standards. As in Mainella, [t]he Court can identify no principled basis for calling one 'minor' and one 'moderate,' . . . only the application of a conclusory label." 459 F. Supp. 2d at 102.

Nonetheless, NPS labeled the impact of PWC emissions on water quality as "negligible." There is no specific and detailed explanation as to how it arrived at that conclusion; without such an explanation, there is no rational connection between the facts found (quantitative data) and the final conclusions reached (negligible impact and non-impairment). Given that the threshold volume of available water for dilution of each pollutant was calculated to be within national standards, the impact of PWC use could conceivably have been described as negligible, minor, or

moderate.  However, there is no discussion of why NPS chose to conclude the impact was negligible, as contrasted with minor or moderate.

A related defect in the agency's analysis is the absence of any logical link between the impact thresholds (e.g. negligible, minor, moderate, or major), and the ultimate conclusion that PWC use does not impair park resources under the Organic Act.  Why, for instance, would a "major" impact not qualify as an "impairment" when a major impact means that chemical, physical, or biological effects "would be detectable and would be frequently altered from the historical baseline or desired water quality conditions"? PIRO-00277.  The standards used by NPS are related to the impact thresholds crafted by the agency, but there is no indication as to why emission levels that are "at or below" water quality standards represent only a "moderate" impact rather than an impairment.  Id. As in Mainella, the reasoning provided offers the Court, and the public, little or no basis for understanding why an identified impact fails to rise to the level of an impairment.  459 F. Supp. 2d at 101; see Greater Yellowstone Coalition, 577 F. Supp. 2d at 201 ("NPS entirely fails to explain why a finding of minor, moderate, and major adverse impacts on soundscapes does not constitute impairment. . . .").

Finally, there is no discussion in the EA of why national water quality standards, which, by definition, apply to the whole

country, provide the appropriate benchmarks for assessing impacts to the Gulf Islands park. The EA's reasoning is tethered to the national standards at every turn, from the calculation of acceptable volume thresholds to the definition of each impact level, but there is no explanation of why those uniform national standards should be applied to impacts within this park. See Greater Yellowstone Coalition, 577 F. Supp. 2d at 207; GUIS-00170 (noting that to determine impairments, NPS must "evaluate 'the particular resources and values that would be affected'") (citing 2001 NPS Policies). NPS must articulate why, in carrying out its obligation to evaluate park-specific impacts, it relies on water quality standards that apply to a range of locations across the country. NPS offers no link between the national standards and standards (if they exist) that would be appropriate to the national park system as a whole, as well as those that would be appropriate to the values and resources of a specific park. In short, to reason that an impact is not an impairment in part because it does not reach a certain standard without explaining why that standard is the right one omits a critical step in the agency's reasoning.

### 4. Air Quality

NPS' air quality analysis followed much the same methodology as its water quality analysis. After considering the national ambient air quality standards ("NAAQS") set forth in the Clean Air Act, as well as additional protections required by the Organic Act

and 2001 Management Policies, GUIS-00290, NPS estimated emissions for several polluting compounds produced by jetskis. Id. at 00290-91. As with its analysis of water quality, the agency then identified impact thresholds for these pollutants, ranging from "negligible" to "impairment." Id. at 00293. NPS concluded that adverse impacts to air quality under Alternative B would be negligible for 2002 and 2012, the same conclusion that it reached for Alternative A (reinstatement of jetskis as previously managed). GUIS-00302-03.

Negligible adverse impacts, according to NPS, are those where "[e]missions would be less than 50 tons/year for each pollutant" and "[t]he first highest 3-year maximum for each pollutant is less than NAAQS." Id. at 00293. The EA does not explain how NPS arrived at a standard of 50 tons/year. The agency stated that NAAQS standards, as well as "additional protection" beyond the Clean Air Act provided by NPS under Management Policies and the Organic Act,[24] would serve as benchmarks for air quality. GUIS-00290. It provided the NAAQS values for a range of pollutants in table form. Id. at 00230 (Table 7). The table shows that the standards for each pollutant vary markedly. For instance, the NAAQS maximum is 100 micrograms per cubic meter for nitrogen dioxide, 50 micrograms per cubic meter for particulate matter, and 15 micrograms per cubic meter for fine particulate matter. Id. In

---

[24] This "additional protection" is never described.

the face of those greatly varying values for each pollutant, the impact baselines are uniform, requiring less than 50 tons/year for each pollutant in order to support a conclusion of even negligible impacts. As noted, there is no explanation of where that number, 50 tons/year, is derived from, or why it applies uniformly to pollutants whose national standards differ so significantly.

Defendants and Intervenors do no more than simply assert that NPS conducted the proper analysis of these impacts. See Intervenors' Mot. at 27 ("[T]his approach produced results that still found only negligible impacts on air quality."); Defs.' Reply at 7 ("Even under [a] more conservative approach, the data revealed that PWC use will result in only negligible impacts on air quality."). Their arguments do little more than repeat the conclusions of the EA, without addressing whether NPS used conclusory terminology to justify its conclusions or otherwise failed to explain how the facts found related to the conclusions reached. In conducting an APA review, the Court must carefully scrutinize the administrative record to ensure that its examination is the sort of "thorough, probing, in-depth review" required by the statute. Overton Park, 401 U.S. at 415; Midtec, 857 F.2d at 1499.

As with its water quality decision, NPS failed to provide a rational link between its objective factual data and its ultimate conclusions regarding non-impairment. It is virtually impossible, without further explanation, to discern how the same tonnage cutoff

of 50 tons/year supports a non-impairment finding for all pollutants even though the NAAQS for them vary greatly, as already discussed. Without such information, NPS' reasoning is opaque, at best, and its final determinations are impermissibly conclusory. See also Mainella, 459 F. Supp. 2d at 101.

An additional difficulty with its analysis is NPS' failure to make clear, as discussed earlier, why NAAQS represents the appropriate benchmarks for national parks. Those standards are national air quality maximums, and those appropriate for national parks, and particular national parks, may be very different and may be much lower. What is more, NPS admits that "specific park air quality related values can be adversely affected at levels below the national standards or by pollutants for which no standard exists," and notes that this is why the Organic Act and 2001 Management Policies offer "additional protection beyond that afforded" by NAAQS. GUIS-00290. However, those additional protections are never identified or discussed. NPS analyzes impairments only with reference to standards imposed by EPA. Finally, as with its water quality analysis, one is left to wonder how following the national air quality standards allows NPS to comply with its own internal policy to "perpetuate the best possible air quality." 2001 Management Policies at 4.7.1 (emphasis added); see Greater Yellowstone Coalition, 577 F. Supp. 2d at 207, 209.

## 5. Soundscapes

The EA's analysis of impacts to soundscapes fares no better. In announcing the standards against which the impacts will be evaluated, NPS cites to 36 C.F.R. § 3.7 (2006). GUIS-00305. As it existed then, that regulation provided, "[o]perating a vessel in or upon inland waters so as to exceed a noise level of 82 decibels measured at a distance of 82 feet (25 meters) from the vessel is prohibited." 36 C.F.R. § 3.7 (2006). Although NPS noted that this regulation was "developed for enforcement purposes, not impact assessment purposes," its acknowledgment that the regulation "sets a limit for maximum allowable noise, but does not imply that there are no noise impacts from vessels operating below that noise level," is very significant. GUIS-00305. Apart from this regulation, the EA mentions only internal Management Policies and Director's Orders as guiding policies.[25] Id. at 00305-06. In

---

[25] The 2001 Management Policies instruct NPS to "take action to prevent or minimize all noise that, through frequency, magnitude, or duration, adversely affects the natural soundscape or other park resources or values, or that exceeds levels that have been identified as being acceptable to, or appropriate for, visitor uses at the sites being monitored." Id. at 4.9 (emphasis added). According to Director's Order 47: Soundscape Preservation and Noise Management, NPS must implement policies that require, "to the fullest extent practicable, the protection, maintenance, or restoration of the natural soundscape resource in a condition unimpaired by inappropriate or excessive noise sources." Id. at "Purpose and Background" (quoted at GUIS-00304) (emphasis added). According to NPS, a "key concept [in both policies] is the purpose for which a park was established." GUIS-00305.

addition, certain state limitations dictate the time and usage area of PWC use.[26]  Id. at 00305.

The analysis centered on the context, time, and intensity of PWC noise levels.  Context included consideration of other noise-producing activity at the park, such as non-PWC watercraft, military planes, commercial fishing boats, and large ships.  Id. at 00306.  Temporal factors included the time that PWCs are used during the day and throughout the year, and the duration and frequency of noise impacts.  Id.

To measure intensity, NPS relied on a study of PWC noise in Glen Canyon National Recreation Area, and used its results to reach its conclusions in the Gulf Islands EA.  GUIS-00308.[27]  That study found that "maximum sound levels for [a single] personal watercraft at 25 meters (82 feet) ranged from approximately 68 to 76 decibels."  Id. at 00307.  According to the EA, these totals do not "exceed existing noise standards," id., although NPS is not specific as to whether this conclusion is based upon the standard set in 36 C.F.R. § 3.7, or some other measurement.

---

[26]  Florida restricts the time during which jetskis can be used:  PWCs "cannot be operated from one-half hour after sunset to one-half hour before sunrise."  GUIS-00305.  Mississippi imposes a restriction on usage areas: PWCs are "restricted to flat-wake speed within 100 feet of any small craft, marina, public boat launch ramp, or behind a water skier."  Id.

[27]  The EA does not indicate whether Glen Canyon National Recreation Area is sufficiently similar to Gulf Islands that decibel data from the former park can be used to measure decibel levels at the latter park.

All these considerations were incorporated into the creation of impact thresholds that ranged from "negligible" to "impairment." Id. at 00311. By way of illustration, NPS used the following description of a moderate impact:

> In areas where management objectives call for natural processes to predominate, natural sounds would predominate, but motorized noise could occasionally be present at low to moderate levels. In areas where motorized noise is consistent with park purpose and objectives, motorized noise would predominate during daylight hours and would not be overly disruptive to noise-sensitive visitor activities in the area; in such areas, national sounds could still be heard occasionally.

Id. Assessing Alternative B, NPS determined that "[n]oise from [PWC] would be short-term in duration but would be expected to occur over the long-term. Impacts would be negligible to minor adverse depending on the location, [sic] within the unit, the time of day, and the time of year." Id. at 00315.

As with water quality, there is no explanation as to why the standards announced in 36 C.F.R. § 3.7 are appropriate, or if they are the standards actually used by NPS--a point never made entirely clear in the EA. NPS introduces the § 3.7 standards with caveats as to their applicability, but then appears to proceed to use them as benchmarks. See GUIS-00173; 00305 ("This regulation sets a limit for maximum allowable noise, but does not imply that there are no noise impacts from vessels operating below that noise level."). Without further explanation of how the regulations

factor in to the creation of impact thresholds and the impairment analysis, if at all, the reasoning is flawed under the APA.

Additionally, the impairment thresholds are not connected to any objective standards that have been announced or evaluated. For instance, PWC noise representing a minor impairment in areas where noise is expected is that which "could be heard frequently throughout the day at moderate levels, or infrequently at higher levels, and natural sounds could be heard occasionally." GUIS-00311. There is no way of knowing the objective meaning of "frequently," "moderate levels," or any other qualifiers. The EA offers the same analysis in describing other impact thresholds. As the Mainella Court reasoned, "[a]n unbounded term cannot suffice to support an agency's decision because it provides no objective standard for determining what kind of differential makes one impact more or less significant than another." 459 F. Supp. 2d at 76.

The quantitative data presented also exposes difficulties with NPS' reasoning. Tables 50 and 51 of the EA report the decibel levels for PWC use in the Florida and Mississippi areas of the park. GUIS-00309. At the Perdido Key Area, the operation of 25 PWCs at a distance of 25 meters, which, according to the EA, represents peak usage for that area, creates 90 decibels of noise, far above the limit set in 36 C.F.R. § 3.7. Id. at 00311, 00308-09. Worse yet, NPS expects an increase to 63 PWCs, operating at 94 decibels, by 2012. GUIS-00309.

On a "typical summer day," visitors can expect to encounter four to five jetskis at Perdido Bay. Id. at 00306. According to the EA, one jetski produces 76 decibels of noise at a distance of 25 meters, and two produce 79 decibels at the same distance.[28] The tables do not indicate the anticipated noise level for a typical summer day at each location where there will be four to five jetskis. However, what is clear is that on the peak days, noise levels will exceed the standard announced in 36 C.F.R. § 3.7--82 decibels of noise at 25 meters (82 feet). See GUIS-00309 (Tables 50 and 51).

There is no explanation as to how these peak days, where the standard for 25 meters is plainly exceeded in Florida and Mississippi areas, see GUIS-00306, factor into the soundscape impairment analysis. The EA acknowledges that under Alternative B (reinstatement of jetskis with certain limitations on their use), the types of adverse impacts "would be generally the same as alternative A." GUIS-00314. It states that the flat-wake zone would minimize these impacts for shoreline users, but says nothing about the impact on visitors who are far enough from shoreline but still within 25 meters of PWCs on peak days, or the impact on days

---

[28] The GUIS EA includes a table of commonly experienced sounds in order to provide a meaningful understanding of decibel levels. The sound level of two PWCs (79 decibels), which is below the number expected on a typical day, is roughly equivalent to the sound emitted by an "automatic dishwasher" or vacuum cleaner, and being "near [a] drilling rig." GUIS-00232 (Table 8).

where enough jetskis are aggregated so that permissible noise levels are exceeded. Finally, there is no explanation as to why decibel levels at greater distances are consistent with the non-impairment finding; indeed, there are no announced numerical standards such as those contained in § 3.7, other than for decibel levels at 25 meters. Nor is it explained why noise that is "short-term" in duration but occurs regularly over the long-term still represents only a negligible to minor impact. See GUIS-00315.

According to Defendants and Intervenors, the EA conducted an adequate analysis of the impacts on soundscapes at Gulf Islands. The Government argues that "NPS initially described the impairment standard for each resource studied, completed an extensive analysis of that resource and reached an informed and rationally based decision as to whether impacts from PWC use result in impairment." Defs.' Mot. at 34. Describing the soundscapes analysis as it relates to Plaintiffs' NEPA challenge--which is the only context in which Defendants devote any specific attention to the issue--the Government merely repeats the findings made for Pictured Rocks and then asserts that there were similarly rational conclusions reached at Gulf Islands. Id. at 22-23; Defs.' Reply at 7-8.

Defendants and Intervenors argue that the EA analysis rationally took into account PWC distribution and ambient noise throughout the park in deciding that jetskis did not represent an impairment to soundscapes. Intervenors' Mot. at 4-5, 27-29.

However, the mere cursory recitation of NPS findings falls far short of the kind of explanation required to overcome an APA challenge.  Intervenors rely in large part on the future conversion from two-stroke to quieter four-stroke engines, which, as noted earlier, raises an additional set of questions.  They attempt to minimize the impacts to soundscapes by citing to the eventual transition to quieter engines.  However, any argument based on this transition ignores the fact, noted earlier, that NPS properly elected to take a "conservative" approach to the analysis, 71 Fed. Reg. 26,237, and relied only on data from the louder, older two-stroke engines in making calculations for 2012. GUIS-00313.  The conversion to four-stroke engines was not a reason relied upon by the agency in arriving at its non-impairment finding, and therefore it cannot be relied upon by Intervenors as a post-hoc rationalization.  <u>State Farm</u>, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

### 6.  Vegetation

The analysis of impacts to shoreline and sub-aquatic vegetation suffers from many of the same infirmities already discussed.  NPS internal policies relied upon in the EA call for natural shoreline processes to "continue without interference." GUIS-00315.  The agency is to mitigate the effects of any activities that alter these processes, and "restor[e] natural

conditions." Id. Under Executive Order 11,990, federal agencies must "avoid short- and long-term adverse impacts associated with the destruction or modification of wetlands whenever possible."[29] Id. at 00315-16.

NPS has relied solely on these standards for the crafting of impact thresholds. NPS acknowledged in its vegetation analysis that there would be increased PWC use by 2012 which would heighten the impacts on vegetation. Nonetheless, the agency concluded that no impairment would occur, and that effects on vegetation both on the shoreline and in the water would be negligible to minor. Id. at 00321. A negligible impact was defined as one where "[n]o shoreline vegetation or submerged aquatic vegetation communities are present in areas likely to be accessed by personal watercraft; no impacts or impacts with only temporary effects are expected." A minor impact is one where "[o]ccasional impacts are expected, but with no impacts or very limited impacts that are not expected to threaten the continued existence of plant species or viable functioning communities within the national seashore." Id. at 00316-17.

In its analysis of Alternative B, NPS states that the flat-wake restriction would minimize impacts, but that nearly half of the potential seagrass habitat within the Florida portion of the

---

[29]    In addition to the requirement to preserve shoreline and aquatic flora, NPS recognizes that Gulf Islands' vegetation serves as important habitat for a variety of animal species. See, e.g., GUIS-00240 (fish), 00244 (manatee), 00246 (terrestrial mammals).

park "would be open to full-throttle PWC use." Id. at 00320-21
(explaining that one-quarter of Mississippi seagrass would be
exposed). The effectiveness of the restrictions is immaterial if
there is no explanation of why certain PWC activity that has the
potential to cause such serious "direct impacts" as "collision,
uprooting, and sediment alteration" in nearly half of Florida's
seagrass does not rise to the level of an impairment. Id. at
00320. There are no objective standards given by which the level
of impact can be gauged. The language in the impact thresholds is
impermissibly conclusory,[30] and fails to provide any necessary
rational connection between the finding of non-impairment and the
data observed.

### 7. Wildlife

The EA's wildlife analysis addresses impacts to habitats, the
effects that PWC noise has on aquatic fauna, and the impacts on
threatened, endangered, or other special status species. A central
difficulty with the analysis of impact to habitats resembles a flaw

---

[30]    Additionally, as Plaintiffs observed at oral argument,
Tr. at 22, there is no explanation why, for an impact to rise to
the level of an impairment, the damage to "the shoreline or shallow
water environment" "must be so severe that the park's shoreline or
submerged vegetation would no longer function as a natural system,"
GUIS-00323. The agency fails to explain why impacts should need to
reach such a seemingly drastic point to trigger the protections of
the Organic Act. See 2001 NPS Policies at 1.4.5 (defining
impairment as "an impact that, in the professional judgment of the
responsible NPS manager, would harm the integrity of park resources
or values, including the opportunities that otherwise would be
present for the enjoyment of those resources or values"). 
"Impairment" does not necessarily mean destruction.

in the vegetation analysis: an impairment at Gulf Islands occurs only when impacts are so intense or sustained that they result in "the elimination of a native species or significant population declines in a native species." GUIS-00323. The fact that NPS provides a definition for an impairment in this context implies that all other possible impacts--from "negligible" to "major"--do not qualify as an impairment of park resources. Conceivably, therefore, under NPS' reasoning, a finding that PWC use represents a "major" impact, where "[m]ortality and other effects are expected on a regular basis," would be fully consistent with the Organic Act, as it would not rise to the impairment level set forth in the EA. How can such a draconian definition of impairment be consistent with the agency's obligation under the Organic Act to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations"? 16 U.S.C. § 1 (emphasis added).

Additionally, NPS concedes that under Alternative B "PWC use in areas providing essential fish habitat could disrupt normal feeding and other critical life functions of fish and shellfish species and could adversely affect suitability of these areas to meet life cycle requirements." GUIS-00328. Nor does NPS indicate how such threats to wildlife are consistent with its management goal to "maintain[] components and processes of naturally evolving

national seashore ecosystems, including natural abundance, diversity, and the ecological integrity of plans and animals." Id. at 00322.

In assessing the impact of noise on aquatic fauna, NPS reports that flat-wake restrictions are expected to reduce some of the impacts on marine life. However, the EA recognizes that "[m]arine mammals and sea turtles are likely to occur outside of [this zone], and could still be exposed to significant levels of PWC noise." Id. at 00333. That noise, when created by 25 PWCs in one area, is equivalent to 152 decibels underwater; when two PWCs are in one area, the decibel level only drops to 141. See id. at 00331 (Table 52). When exposed to less than one hour of continuous PWC noise at 96 decibels, bottlenose dolphins experience "substantially reduced echolocation and communication abilities." Id. at 00330. Therefore, when exposed to the noise from just two jetskis, which is far less than the expected number on a typical summer day, the bottlenose dolphins would experience "substantially reduced echolocation and communication abilities." As NPS reports, bottlenose dolphins are "the most common marine mammal documented in the waters of the national seashore, both in Florida and Mississippi." Id. at 00238.

Nevertheless, NPS concluded that Alternative B presented only "long-term, minor to moderate, adverse impacts to aquatic fauna." Id. at 00333. NPS uses the same definition of these terms as it

used to analyze the impacts to habitat; no definitions have been tailored to the impacts due to noise alone, despite the fact that NPS is able to calculate underwater decibel levels caused by PWC use and then assess the impact of varying underwater levels on fauna. There is no mention of how the impact on bottlenose dolphins, or any other species, is related to the non-impairment determination for wildlife. No reasoning is offered to make clear the connection between the data and the conclusion.

Finally, NPS reports the potential impacts to a range of threatened, endangered, or other special status species. Gulf Islands is "a permanent or seasonal home to 29 state or federal threatened, endangered, or species of special concern animals and plants." Id. at 00181. NPS' inquiry was guided by the Endangered Species Act, whose language it adopted in creating impact thresholds. The agency then discusses the expected impact that each alternative would produce on the protected flora and fauna. Id. at 00337-350. The EA relies heavily on the flat-wake restrictions in concluding that re-introducing PWCs to Gulf Islands under Alternative B "would be unlikely to adversely . . . affect any federally or state-listed species." GUIS-00350. For these reasons, the Court concludes that NPS's explanation with respect to this impact does not contain the same defects as other aspects of the wildlife analysis.

### 8. Visitor Use and Safety

NPS examined PWCs' effects on visitor use of the park, as well as the impacts on visitor safety and conflicts. For each, NPS largely followed the methodology described above, announcing baselines, stating its assumptions, and describing impact thresholds on a scale from "negligible" to "major." (No definition of impairment was provided.) See GUIS-00350-71.

The language used in the impairment thresholds again presents a problem for NPS' analysis. For instance, a "moderate" impact means that "[c]hanges in visitor use and experience would be readily apparent and likely long term." Id. at 00354. The agency explained that under its Management Policies, it recognizes a duty to "provide opportunities for forms of enjoyment that are uniquely suited and appropriate to the superlative natural and cultural resources found in the particular unit." Id. at 00353. There is no explanation as to why moderate adverse impacts do not rise to the level of an impairment, even though such impacts could lead to a situation where "[s]ome visitors who desire to continue their use and enjoyment of the activity . . . would be required to pursue their choice in other available local or regional areas," i.e., they would be driven out of the park. Id. at 00354.

While NPS does examine individual activities in the park, such as PWC use, swimming, non-motorized boating, and fishing, it never connects its obligations under the Organic Act and duties under its

own policies to the language defining the impacts.  As in <u>Mainella</u>, the terms used to describe NPS final assessments are merely "indeterminate and conclusory."  459 F. Supp. 2d at 102.

The EA is similarly flawed in its analysis of impacts on visitor safety and conflicts.  The conclusory labeling of impacts bears no identifiable relationship to NPS' guiding policies, and therefore the agency's determination of impacts on various aspects of visitor experience cannot be meaningfully reviewed.  In describing impact thresholds, NPS states that "[w]here impacts to visitor experience or visitor safety become minor or moderate, it is assumed that current visitor and safety levels would begin to decline and the park would not be achieving some of its long-term visitor goals."[31]  <u>Id.</u> at 00364.  This significant description of "minor or moderate impacts" is never connected to the impairment conclusions reached by NPS.  Instead, adverse impacts that are "long-term" and "minor" are simply declared with no discussion of why they do not rise to the level of impairments.  <u>See</u> <u>id.</u> at 00370.

For all the foregoing reasons, the Court concludes that the impairment analysis and NPS conclusions of Alternative B's impact

---

[31]  In setting forth its "guiding regulations and policies," the agency reports that among the internal long-term goals included in NPS' <u>Strategic Plan</u> is "reduc[ing] the visitor safety incident rate 10% from 1997 levels."  GUIS-00353.  There is no discussion of how the anticipated decrease in visitor safety levels associated with minor adverse impacts is related to the goal of reducing the visitor safety incident rate.

as to water quality ("negligible adverse"), air quality ("negligible adverse" to "minor adverse"), soundscapes ("negligible to minor adverse"), shoreline and submerged aquatic vegetation ("negligible adverse"), wildlife ("negligible" and "minor to moderate" adverse), and visitor use and experience (beneficial for PWC users and adverse for non-users) are profoundly flawed.  See Mainella, 459 F. Supp. 2d at 103, 108; see also Greater Yellowstone Coalition, 577 F. Supp. 2d at 210 ("While the Court will defer to an agency's exercise of expertise, the 'Court will not defer to the agency's conclusory or unsupported assertions.'") (quoting McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

In summary, the Court concludes that the GUIS Final Rule, which relies upon the conclusory analysis in the EA, is arbitrary and capricious because NPS' conclusion that PWC use would result in non-impairment under the Organic Act is not based on reasoned explanations.  The case will be remanded to NPS so that it may have an opportunity to provide adequate reasoning for its conclusions. See MCI Telecomm. Corp. v. FCC, 143 F.3d 606, 609 (D.C. Cir. 1998); Mainella, 459 F. Supp. 2d at 103.

### D.   NEPA

Both the National Jetski Rule and the Settlement Agreement provide that NPS must comply with NEPA's specific procedural requirements for exercising its rulemaking authority regarding re-

introduction of PWCs into PIRO and/or GUIS.  NEPA is a procedural
statute designed to ensure that decision-makers in federal agencies
are fully informed about the environmental impact of decisions they
are considering and that the deliberative process in environmental
matters is subject to public review and comment.  See Robertson v.
Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) ("The
sweeping policy goals announced in § 101 of NEPA are thus realized
through a set of 'action-forcing' procedures that require that
agencies take a 'hard look' at environmental consequences . . . and
that provide for broad dissemination of relevant environmental
information. Although these procedures are almost certain to affect
the agency's substantive decision, it is now well settled that NEPA
itself does not mandate particular results, but simply prescribes
the necessary process.") (citation and quotations omitted); see
also Greater Yellowstone Coalition, 577 F. Supp. 2d at 189.

The Council on Environmental Quality promulgates regulations
that provide guidance to federal agencies for their implementation
of NEPA.  Agencies must prepare an EIS for "every recommendation or
report on proposals for legislation and other major Federal actions
significantly affecting the quality of the human environment." 42
U.S.C. § 4332(2)(C).  CEQ has issued regulations that govern the
format and content of an EIS.  See 40 C.F.R. § 1500.4 (listing
guidelines).  In an EIS, the agency must "take a 'hard look' at the
environmental consequences before taking a major action."

<u>Baltimore Gas & Elec. Co. v. Natural Res. Def. Council</u>, 462 U.S. 87, 97 (1983) (citations omitted).

An EIS is not prepared as a matter of course; the EA, which is a less thorough report, may suffice in certain situations. <u>Monsanto Co. v. Geerston Seed Farms</u>, __ S. Ct. __, 2010 WL 2471057 (June 21, 2010). The EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a). After completion of an EA, an agency may conclude that no EIS is necessary. If so, it must issue a FONSI, stating the reasons why the proposed action will not have a significant impact on the environment. <u>Id.</u> at § 1501.4(e).

Courts reviewing the decision not to produce an EIS apply the same standard of review--arbitrary and capricious--as they do under the APA. <u>See</u> <u>Dep't of Transp. v. Pub. Citizen</u>, 541 U.S. 752, 763 (2004) ("An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"); <u>Town of Cave Creek, Ariz. v. FAA</u>, 325 F.3d 320, 327 (D.C. Cir. 2003).

### 1. "Hard Look"

Courts evaluating the agency's decision under NEPA consider whether the agency has met four requirements:

> First, the agency [has] accurately identified
> the relevant environmental concern. Second,
> once the agency has identified the problem it
> must have taken a "hard look" at the problem
> in preparing the EA. Third, if a finding of no
> significant impact is made, the agency must be
> able to make a convincing case for its
> finding. Last, if the agency does find an
> impact of true significance, preparation of an
> EIS can be avoided only if the agency finds
> that the changes or safeguards in the project
> sufficiently reduce the impact to a minimum.

Cave Creek, 325 F.3d at 327 (citations and quotations omitted).

Plaintiffs argue that the agency failed to meet the first three requirements. Pls.' Mot. at 40-42. Their chief contention is that in the EAs for both parks, NPS failed to take the requisite "hard look" at the "relevant environmental concern." See id. at 40-41; Pls.' Reply at 2, 18.

As an initial matter, the Court finds that, as in Mainella, NPS' "impairment analysis [under the Organic Act] served as its NEPA analysis." 459 F. Supp. 2d at 106. Two reasons support this finding. First, the EAs made no attempt to distinguish their impairment analysis from their NEPA analysis; they simply presented the data and stated their conclusions as to impairments. Cf. GUIS-00572 (stating in FONSI that "[t]he [EA] was prepared in accordance with [NEPA].") Second, Defendants rely on the same reasoning in making arguments under the Organic Act as they do under NEPA. See Defs.' Mot. at 18-24; 29-34 (describing EAs' impairment analysis in making arguments under Organic Act and NEPA); Pls.' Mot. at 40

(advancing NEPA argument by referencing arguments made under Organic Act).

For all the reasons stated _supra_ in Section III.C, Defendants' analysis in the GUIS EA was conclusory, internally inconsistent, and failed to adequately explain the connection between objective facts and conclusions reached.  Thus, the agency failed to take the "hard look" required by NEPA.  _Mainella_, 459 F. Supp. 2d at 106. Therefore, both the Final Rule and FONSI for GUIS, which relied on the inadequate reasoning contained in the EA, were arbitrary and capricious, and an abuse of discretion.  Consequently, the decisions are remanded to the agency so that NPS may provide reasoning consistent with this Opinion.

NPS prepared an EA for Pictured Rocks,[32] as it did for Gulf Islands, and issued a FONSI and Final Rule concluding that Alternative B is the preferred policy.  Restricted PWC use is therefore now allowed within the park.  70 Fed. Reg. 61,896.  As described above, the restrictions limited the time, location, and manner of jetski operation.  As with the Gulf Islands EA, NPS took into account "guiding policies and regulations," explained its methodologies, set forth impact thresholds that categorized the magnitude of impacts (e.g. negligible, minor, moderate, major, or impairment), analyzed data, and announced its conclusion regarding

---

[32]     It will be remembered that Plaintiff Robert Goodman (as well as all other Plaintiffs) has standing, under the Settlement Agreement, to challenge on NEPA grounds, the Final Rule issued by NPS' for PIRO.

impairments.  See, e.g., PIRO-00077-88 (analyzing impacts to water quality).

Unfortunately, the Pictured Rocks EA suffers from the same deficiencies as the EA prepared for Gulf Islands.  For instance, in analyzing water quality, NPS was guided by the same basic policies and regulations as it was at GUIS--EPA national standards and regulations, as well as state and local statutes.  Id. at 00077-78. An additional consideration for PIRO is Michigan's declaration that the the waters at PIRO are "outstanding state resource waters." Id. at 00077.  As a result, their quality cannot be lowered (although short-term, temporary lowering of water quality may be permitted on a case-by-case basis).  Id.

Nonetheless, the analysis at PIRO is nearly identical to that conducted for GUIS, although NPS did not claim to be guided by any similarly strict regulation prohibiting any lowering of water quality.  The impact thresholds contain language as repetitive as that used for GUIS.  See PIRO-00082.  Of particular significance is the fact that at PIRO, as at GUIS, there is no explanation of how those impact thresholds relate to the impairment finding, nor why the national water quality standards are appropriately applied to Pictured Rocks, instead of site-specific ones.  As already noted, Michigan regulations require that water quality not be lowered. The EA found that negligible to minor adverse impacts would occur in the area of the park where PWC use is permitted under

Alternative B, yet NPS concluded that no impairment would result. Further, NPS conceded in the EA that there "would be a concern for aquatic life" from the cumulative impact of all watercraft use at certain areas of the park.  Id. at 00087.  Without a clearer link between the national and state standards, the announced impact thresholds, and the conclusions reached, the water quality analysis does not hold together logically.

The air quality analysis in the Pictured Rocks EA repeats nearly verbatim the background, methodology, and impact thresholds that were used in the Gulf Islands EA.  Compare PIRO-00088-96 to GUIS-00288-299.  For example, both EAs define a negligible impact as one that results in less than 50 tons/year of each pollutant, PIRO-00092; GUIS-00293, and both look to the NAAQS as a benchmark for emissions, PIRO-00089; GUIS-00289.

NPS did calculate park-specific PWC emissions for PIRO, but the specific calculations do not salvage the analysis.  As with GUIS, the problem lies in the connection of this data to the conclusions reached.  As with GUIS, there is no explanation of how the tonnage cutoff for each impact threshold was determined--e.g., why was 50 tons/year chosen to reflect a "negligible" impact?  Similarly, the EA never states why a uniform cutoff value is used for each impact threshold (e.g. 50 tons/year is negligible, 100 tons/year is minor), given the fact that the emissions benchmarks for each pollutant vary under the NAAQS.  The reasoning is

inadequate, and therefore reflects NPS' failure to take a "hard look" at the problem and reach a reasoned, logical conclusion.

The soundscapes analysis for PIRO is even more problematic than that conducted by Defendants for GUIS. The Pictured Rocks EA, which was produced in 2002, did not use the most recent data collected by NPS in its 2001 study of PWC noise levels. As a result, there is little data presented that measures decibel levels at PIRO.[33] As in the GUIS EA, NPS announces that 36 C.F.R. § 7 is one of the guiding regulations and policies undergirding its analysis; that regulation prohibits operating watercraft on inland waters where the noise level exceeds 82 decibels at 82 feet. Despite the reliance on this standard, NPS admits that PWC operators at PIRO, who commonly travel in pairs as a safety measure, create 85 decibels of noise, thereby exceeding the regulation's limit.[34] PIRO-00103 (describing Alternative A, which NPS admits has the same impacts as Alternative B, except that Alternative B affects a smaller area of the park).

---

[33] The GUIS EA relied on scientific literature and NPS studies conducted in other parks, and then reported the decibel values in numerous tables, see GUIS-00305, 00309. PIRO's EA merely states that PWCs "have been measured to emit 85 to 105 [decibels] per unit, which may disturb visitors," then reports the regulatory guidelines (82 decibels at 82 feet), and sets forth findings on noise levels from a 1974 study conducted by the EPA. PIRO-00101. There is no attempt to conduct the type of quantitative analysis that was conducted for Gulf Islands.

[34] NPS reports that at 200 feet, the noise is reduced to 77 decibels.

In addition, there is no discussion as to how exceeding the decibel limit in its own regulations can possibly be consistent with a finding of "negligible adverse impacts." Id. at 00105. Nor does the EA explain how the impact levels relate to the standards that guide NPS' inquiry. As with GUIS, the analysis and conclusion are impermissibly conclusory, and therefore do not satisfy NEPA's requirements.

The analysis of impacts to Pictured Rocks' wildlife and wildlife habitats closely resembles the analysis conducted for Gulf Islands. As in the GUIS EA, the PIRO EA never explains why, for an impact to rise to the level of an impairment, the impact's "severity, duration, and timing result[s] in the elimination of a native species or significant population declines in a native species, or [it] preclude[s] the park's ability to meet recovery objectives for listed species." Id. at 00107. For instance, an adverse "moderate impact" does not, according to NPS, rise to the level of an impairment, even though a moderate impact is one where:

> Breeding animals are present; animals are present during particularly vulnerable life stages such as migration or juvenile stages; mortality or interference with activities necessary for survival are expected on an occasional basis, but are not expected to threaten the continued existence of the species in the park.

PIRO-00107. As in Greater Yellowstone Coalition, NPS fails to explain why lesser adverse impacts, like the moderate impact described above, might not qualify as an impairment, 577 F. Supp.

2d at 201. Without such an explanation, the EA's discussion of impacts to wildlife does not represent a "hard look" at the problem.

Additionally, although the EA claims that its impact thresholds describe impacts of "PWC use and noise on wildlife and habitat," id., no discussion of noise's effect on wildlife actually appears in its analysis.[35] Id. at 00108-09. Where NPS at least attempted to assess such impacts at Gulf Islands, it merely includes a cursory mention of the potential problem in the PIRO EA without incorporating it into its analysis. See id. Thus, the EA again fails to satisfy NEPA's requirements to fully analyze the impact of noise on wildlife at PIRO.

The examination of shoreline vegetation in the PIRO EA shares the same central defect that was present in the GUIS EA. NPS was guided by the same regulations and policies at PIRO as it was at Gulf Islands (in addition to Michigan state laws[36])--i.e., NPS internal policies and an executive order regarding protection of

_____

[35] NPS listed impact topics that it eliminated from further consideration. See PIRO-00031. The impact of noise on wildlife does not appear on that list.

[36] One of the state laws is the Personal Watercraft Safety Act, described supra, which does not provide benchmarks or standards for the protection of vegetation; rather, it curbs PWC operation. The other Michigan law is a management plan implemented under the Coastal Zone Management Act of 1972, 16 U.S.C. § 1456. According to the EA, "[t]here are no coastal zone management regulations or policies that specifically relate to PWC use on Lake Superior." PIRO-00115.

wetlands.  Those policies seek to ensure that "[n]atural shoreline processes . . . continue without interference."  Id. at 00115.

According to NPS, a "moderate" impact would result in a localized "change in the plant community (e.g. abundance, distribution, quantity, or quality)"--such an impact, however, does not qualify as an impairment.  Id. at 00116.  The impact thresholds describe certain scenarios, but never make clear why, for instance, a change in the quality of a certain plant community, does not run afoul of NPS' stated mandate to preserve natural shoreline processes without interference.  What constitutes a "change in plant community"?  The threshold is vague, and therefore the Court has no basis for reviewing the relationship between that threshold and a "moderate" impact.

Finally, with respect to the impacts on visitors' experience, NPS again fails to meet NEPA requirements.  The flaws discussed with regard to the GUIS EA apply to the PIRO EA.  As at Gulf Islands, the impact thresholds for visitor experience do not sufficiently explain why certain impacts do not rise to the level of an impairment.  A moderate impact, for instance, does not represent an impairment, yet would result in a scenario where "[c]ritical characteristics of the desired experience (such as natural quiet) would be changed. . . . [v]isitor satisfaction would begin to decline or increase [depending on whether the impact is adverse or beneficial.]" PIRO-00121.  There is no discussion of why

allowing a change in "critical characteristics" is consistent with NPS' duty to prevent impairments, nor why a reduction in visitor satisfaction (in the case of an adverse impact) comports with NPS' stated goal to reach a level of 91% visitor satisfaction. Id. at 00106-107; see id. at 00067 (noting that PWC use was a chief source of visitor complaints.) Without understanding how impact thresholds are connected to NPS' non-impairment mandate, the Court is unable to meaningfully assess the agency's conclusion that PWC has a negligible adverse impact on visitor experience.

Additionally, in analyzing impacts to visitor conflicts and safety, NPS fails to explain the connection between its impact thresholds and "the guiding regulations and policies" that it purports to follow. NPS states that when impacts become minor or moderate adverse, "it is assumed that current visitor satisfaction and safety levels would begin to decline and the park would not be achieving some of its long-term visitor goals." Id. at 00127. NPS then concludes that PWC use would indeed have a minor adverse impact on safety and visitor conflicts. According to the assumptions behind the impact thresholds, NPS can therefore expect a decline in safety levels as well as some failure to meet its long-term visitor satisfaction goals. NPS failed to explain how this is consistent with its obligation to prevent impairments. Finally, there is no attempt to square its conclusions with its

policy of "striv[ing] to protect human life and provid[ing] for injury-free visits." Id. at 00126.

The EA's analyses of impacts to water quality, air quality, soundscapes, vegetation, wildlife, and visitor experience[37] all relied on conclusory reasoning. NPS' FONSI and Final Rule for PIRO adopted the reasoning set forth in the EAs. Therefore, the FONSI and the Final Rule are arbitrary and capricious; NPS failed to meet its obligation under NEPA to take a "hard look" at the environmental problem. The matter is remanded so that NPS may provide reasoning consistent with the Opinion.

### 2. CEQ Factors

Under NEPA, an agency must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). CEQ regulations set forth what "significantly" means in this context. 40 C.F.R. § 1508.27. The regulations require consideration of both the context and the intensity of the proposed action. Id. Parties dispute whether NPS appropriately considered three of the ten intensity factors listed in the regulations.

According to CEQ, among the factors that "should be considered in evaluating intensity" are: (1) "[t]he degree to which the proposed action affects public health or safety;" (2) "[u]nique

---

[37] It is not necessary to examine the other impact topics assessed in the PIRO EA: "cultural resources," "socioeconomic effects," and "national lakeshore management and operations."

characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas;" and (3) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(2)-(4).

In its FONSI for each park, NPS discusses each factor and states its conclusion as to why the proposed re-introduction of jetskis would not "significantly" affect the quality of the human environment. See GUIS-00572-582; PIRO-00193-199.

NPS' analysis of two of the factors--the parks' unique characteristics and the effects on public health and safety--relies on the impact assessments described in its EAs. See GUIS-00577-78; PIRO-00197. For instance, the FONSI for Gulf Islands states that "[t]he preferred alternative would have negligible adverse impacts to water quality for all human health and ecotoxicological benchmarks analyzed." GUIS-00577. Similarly, in the Pictured Rocks FONSI, NPS relied on conclusions from its EA in assessing uniqueness, reporting that "[c]ontinued PWC use in the area near the [Sand Point] wetlands would have negligible adverse impacts." PIRO-00197.

As discussed at length above, there are fundamental problems with the reasoning in each EA. To the extent that NPS relies on impairment assessments from the EA that have been found to be

conclusory, it may not rely on these assessments to support its analysis of the challenged CEQ significance factors. To do so would be irrational and arbitrary and capricious.

NPS does not base its analysis of the third challenged factor--"the degree to which the effects on the quality of the human environment are likely to be highly controversial"--on conclusions from the EA. Rather, NPS identified the controversial effects that motivated the preparation of an EA at each park, and then declared that "[t]here were no other highly controversial effects identified during either preparation of the EA or the public comment period." GUIS-00578; PIRO-00198.

According to Plaintiffs, there is in fact evidence in the record that the decision to again permit PWCs was a highly controversial one. They cite to the sizeable number of public comments, as well as letters from two state agencies, that favor a PWC ban. Pls.' Mot. at 38. Defendants and Intervenors dispute Plaintiffs' interpretation of the regulation, and argue that mere opposition to a proposed action does not mean that the effects of that action are highly "controversial," as that term is used in the CEQ regulations.

Properly understood, this term "refers to cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." Cave Creek, 325 F.3d at 331 (quotations and citations

omitted).  As our Court of Appeals has said, although the term is not defined in the regulations, "certainly something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter."  <u>Fund for Animals v. Frizzell</u>, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975).  Therefore, the opposition contained in the public comments referred to by Plaintiffs does not render the effects of the proposed action "highly controversial."

Further, Plaintiffs are simply wrong, in this case, that there was significant disagreement by state agencies which would trigger this CEQ factor.  <u>See</u> Pls.' Mot. at 39.  As Defendants and Intervenors detail in their submissions, and as the record reflects, the state agencies did not take issue with the "size, nature, or effect" of the proposed action.  Rather, the one-page letter from the Michigan Department of History, Arts and Libraries merely states that the Department "favor[s] the <u>no-action alternative</u>."  PIRO-00319 (emphasis in original).  No mention is made of any disagreement with the analysis in the study.  Similarly, with respect to the removal of the ban at GUIS, the Florida Department of State (Division of Historical Resources) submitted only a one-page letter which stated that the no-action alternative "would best protect and preserve cultural resources."  GUIS-05826.  These brief and summary statements do not represent

the type of disagreement that qualifies as "highly controversial" under CEQ regulations.[38]

Thus, on this record, the FONSIs' analyses are so weak that it cannot be determined whether an EIS should have been prepared. Consequently, the FONSIs are remanded to the agency for further analysis of the uniqueness and safety factors. Cf. Grand Canyon Trust v. FAA, 290 F.3d 339, 347 (D.C. Cir. 2002) ("We remand the case because the record is insufficient for the court to determine whether an EIS is required."). Defendants' and Intervenors' Motions for Summary Judgment are granted with respect to the "highly controversial" factor.

### E.   Settlement Agreement

Plaintiffs' final contention is that NPS violated the Settlement Agreement in issuing its EAs, FONSIs, and Rules. The Agreement requires that, before the agency re-introduces PWCs in each park, it must issue "special regulations" as described in the National Jetski Rule. Further, the process of adopting those regulations must be consistent with "appropriate environmental analysis under [NEPA]." The analysis will, "inter alia, consider the impacts of PWC use in the particular unit." Settlement

---

[38]   Additionally, it should be noted that both state agencies later demonstrated at least some support for the alternatives adopted by each EA.   GUIS-05827 (stating that if the no-action alternative were not selected, "Alternative B would be the next preferred alternative"); PIRO-002534 (letter dated August 10, 2005, stating that the Department has "reviewed and approve[s] the revised Environmental Assessment").

Agreement at ¶¶ 3-4.  Plaintiffs charge that NPS' failure to undertake a "hard look" analysis in its EAs, and its refusal to conduct site-specific studies in the particular units, violated the Settlement Agreement.  Pls.' Mot. at 40-42.

Plaintiffs' argument that the language of the Settlement Agreement mandates a more detailed "site-specific" study than was contained in the EAs cannot prevail.  Tr. at 42.  The Agreement called for NPS to conduct "the appropriate analysis" under NEPA and noted that this would include consideration of impacts in the "particular unit."  Settlement Agreement at ¶ 5.  This language does not require that NPS undertake park-specific studies in order to analyze park-specific impacts.  Rather, it requires that NEPA be followed, and that impacts in the particular unit be considered.  Further, NPS may, consistent with that Act, rely on studies conducted at other locations in order to assess impacts particular to a given park.  Young v. Gen. Serv. Admin., 99 F. Supp. 2d 59, 79 (D.D.C. 2000).

The Settlement Agreement compels NPS to comply with the terms of NEPA, but requires no more than that.  Therefore, the resolution of this dispute does not differ from the outcome of the NEPA claims.  Defendants violated the Settlement Agreement to the extent that their analysis did not meet NEPA's "hard look" requirement, and relied on conclusory reasoning to support its decision not to prepare an EIS.

**IV. CONCLUSION**

For the foregoing reasons, Intervenors' Standing Motion for Partial Summary Judgment is **granted in part and denied in part**, Plaintiffs' Motion for Summary Judgment is **granted in part and denied in part**, Defendants' Motion for Summary Judgment is **granted in part and denied in part**, and Intervenors' Motion for Summary Judgment is **granted in part and denied in part**.  An Order shall issue with this Memorandum Opinion.

July 8, 2010

/s/ _____
Gladys Kessler
United States District Judge

**Copies to**: attorneys on record via ECF